JULES REINHARDT AND MARILYN D. REINHARDT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14506–83.    Filed September 30, 1985.

---

*Gregory K. Wise*, for the petitioners.
*Timothy S. Murphy*, for the respondent.

OPINION

PARKER, *Judge*: Respondent determined a deficiency in petitioners' 1979 Federal income tax in the amount of $43,671. The issue for decision is whether petitioners properly reported a distribution from qualified profit-sharing and pension plans under the 10-year averaging method provided by section 402(e)(1).[1] Resolution of this issue depends on whether petitioner Jules Reinhardt's change of employment status from that of employee to that of independent contractor was a "separation from the service" within the meaning of section 402(e)(4)(A)(iii), even though he continued to perform exactly the same services as a physician after the change.

This case was submitted fully stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Jules Reinhardt and Marilyn D. Reinhardt resided in Lapeer, Michigan, at the time the petition was filed in this case. Petitioners timely filed their 1979 joint Federal income tax return (Form 1040) with the Internal Revenue Service Center in Covington, Kentucky. Petitioner Marilyn D. Reinhardt is a party in this case solely because she filed a joint tax return with her husband for the year in issue. All

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.

references to petitioner in the singular will be to petitioner Jules Reinhardt.

Knollwood Clinic (the clinic) is a Professional Corporation (P.C.) organized under the laws of the State of Michigan. The Clinic renders medical care and treatment through duly licensed physicians. All physicians at the clinic practice medicine under either a standard association agreement or a standard employment agreement. Physicians who practice under association agreements are independent contractors, and physicians who practice under employment agreements are employees of the clinic. Only those physicians who are shareholders in the clinic are eligible to practice at the clinic under employment agreements and thus eligible to participate in the clinic's pension and profit-sharing plans. Except for eligibility in the clinic's pension and profit-sharing plans, the other fringe benefits provided by the clinic are essentially the same for all physicians regardless of their employment arrangement.[2]

Consistent with the clinic's employment policy, petitioner and the clinic executed a 1-year, renewable employment agreement on July 1, 1978. From that date until June 30, 1979, petitioner was a practicing physician and a shareholder-employee of the clinic. Petitioner also served as an officer and director of the clinic. The clinic paid petitioner a salary pursuant to the employment agreement and properly deducted and withheld the appropriate Federal, State, and local taxes from petitioner's wages. Petitioner's employment agreement was identical in all material respects to other employment agreements between the clinic and other employee-physicians. As a shareholder-employee, petitioner was eligible to participate and did participate in the clinic's pension and profit-sharing plans.

Petitioner had other economic interests indirectly related to the operations of the clinic. Petitioner held stock in Doc Development, a corporation that owns the building in which the clinic is located. Petitioner also held stock in Lapeer Apothecary, a corporation that operates the pharmacy associated with the clinic.

---

[2]The employment agreement provides coverage for group term life insurance, but the association agreement does not provide such coverage.

Petitioner desired to establish his own office in the Lapeer area. Petitioner first explored the possibility of establishing his own office in the Lapeer County area on or about January 1, 1979. Petitioner terminated his employment agreement[3] with the clinic on June 30, 1979, in anticipation of establishing his own office in the area. However, pursuant to paragraph 14 of petitioner's employment agreement, petitioner was prohibited from practicing medicine within a 12-mile radius of the clinic for 90 days from the date of termination. Violation of this noncompetition provision would have obligated petitioner to pay the clinic liquidated damages in the amount of $10,000.

On or before the date petitioner terminated his employment agreement with the clinic, petitioner divested himself of all of his economic interests related to the clinic. On June 30, 1979, petitioner sold all of his stock in the clinic and all of his stock in Doc Development, the corporation that owns the clinic's building.[4] In addition, prior to July 1, 1979, petitioner resigned as officer and director of the clinic. As of July 1, 1979, petitioner's only interest in the clinic was that of a creditor for the balance due for the sale of his stock.

While making arrangements to open his own office, petitioner needed a source of income and needed facilities to continue caring for his patients. If he wanted to practice within a 12-mile area of the clinic, petitioner's only option, other than paying the $10,000 in liquidated damages, was to enter into an association agreement with the clinic. Since petitioner was no longer a shareholder of the clinic, petitioner was not eligible to enter into an employment agreement with the clinic. Consequently, on July 2, 1979, petitioner entered into an association agreement with the clinic for a 5-year term. Thereafter, petitioner served the clinic as an independent contractor. The clinic treated petitioner as an independent contractor and paid petitioner fees for performing services. The clinic no longer deducted withholding taxes, and petitioner was given a Form 1099 to report these fees. Petitioner's association agreement with the clinic was identical in all material respects to the

---

[3]Par. 12 of petitioner's employment agreement required 6 months' written notice prior to termination. Petitioners did not submit any evidence that notice was timely given pursuant to the terms of the agreement.

[4]On Jan. 31, 1978, petitioner had sold all of his stock in Lapeer Apothecary, the corporation that operates the pharmacy associated with the clinic.

agreements between the clinic and all of its other nonemployee physicians. For Federal employment tax purposes, the clinic treated petitioner as an employee during the first half of 1979 and as an independent contractor during the second half. However, petitioner rendered the same services as a physician under the association agreement as he had previously rendered under the employment agreement.

On January 20, 1981, petitioner was one of the incorporators of Metamora Medical, P.C. Pursuant to his association agreement with the clinic, petitioner gave the clinic a 6-month notice of termination. After terminating his association agreement, petitioner waited 90 days to begin practicing medicine at Metamora Medical, P.C., to avoid the $10,000 liquidated damages provision in the association agreement.[5] As of April 1, 1981, petitioner had severed all relations with the clinic and was a full-time employee of Metamora Medical, P.C.

After petitioner terminated his employment agreement with the clinic on June 30, 1979, petitioner received a distribution in July of 1979 from the clinic's pension and profit-sharing plans in the amount of $150,744. He reported the distribution on his 1979 return using the special 10-year averaging provision for determining the tax on that distribution. Petitioner did not deduct any auto expenses on his return.[6]

---

[5]This noncompetition provision was essentially identical to the noncompetition provision in the employment agreement.

[6]The petition raises an argument that the Commissioner erred in determining that $2,750 of auto expenses was a deduction against personal service income for purposes of computing the 50-percent maximum rate on personal service income under sec. 1348. The parties stipulated that petitioner Jules Reinhardt deducted no automobile expenses on his 1979 return and that that return, as previously adjusted by respondent and agreed to by petitioners, did not allow any deduction for automobile expense. Petitioners make just a passing reference to this argument on brief. Respondent did not mention the issue in his opening brief and elected not to file a reply brief.

We do not wholly understand petitioners' argument. Petitioners' original return did not include the $2,750 in the computation of the maximum tax, but we do not understand petitioners to suggest that the item does not constitute personal service income. In recomputing petitioners' 1979 tax under sec. 1348 (which was the lowest of the three computations and hence the one used to determine petitioners' tax liability), respondent included reimbursed automobile expenses in the amount of $2,750 as personal service income. However, respondent allowed the same item as a deduction against petitioners' personal service income, creating a wash. Petitioners seem to argue that otherwise properly deductible expenses under sec. 1348 should be deducted only to the extent such expenses are allowed as deductions for the regular tax computation. Petitioners conclude that because they were not allowed a deduction for automobile expenses on their return, these expenses are not properly deducted under sec. 1348. However, if the deduction were not allowed, it would increase the amount of petitioners' tax liability, since reimbursed automobile expense is properly includable in income.

While we do not see how it helps petitioners, they may be drawing a distinction between a

By statutory notice of deficiency dated March 24, 1983, respondent determined that the distribution petitioner received from the clinic's qualified profit-sharing and pension plans did not qualify for the special 10-year averaging method provided by section 402(e)(1) because petitioner had not "separated from the service" of his employer within the meaning of section 402(e)(4)(A)(iii). This lawsuit ensued.

Petitioner argues that the termination of his employment agreement with the clinic on June 30, 1979, constituted a "separation from the service" of the clinic as of July 1, 1979.[7] Petitioner further argues that the distribution on account of that separation from the service was properly reported on his 1979 return using the special 10-year averaging method provided by section 402(e)(1). We must decide whether the termination of petitioner's employment agreement amounted to a "separation from the service" within the meaning of section 402(e)(4)(A)(iii).

Generally, distributions made from a qualified pension or profit-sharing plan are taxable to the recipient as ordinary

---

deduction "allowed" and one "allowable." Sec. 1348(b)(2) provides in part that the term personal service net income means personal service income reduced by any deductions *allowable* under sec. 62 which are properly allocable to or chargeable against such personal service income. Whether the automobile expenses were *allowed* as a deduction on petitioners' return is not determinative of whether such expenses are allowable as a deduction under sec. 1348. See, for example, sec. 1016(a)(2) and sec. 1.1016–3(a)(1)(i), Income Tax Regs., regarding the definitional difference between allowed and allowable. Petitioners do not claim nor did they submit any evidence indicating that the automobile expenses were not allowable under sec. 62 or not properly allocable or chargeable to personal service income. The facts of this case were fully stipulated, but that does not alter the burden of proof which still rests with petitioners. *Service Bolt & Nut Co. Trust v. Commissioner*, 78 T.C. 812, 819 (1982), affd. on other issues 724 F.2d 519 (6th Cir. 1983); *Estate of Luehrmann v. Commissioner*, 33 T.C. 277, 281 (1959), affd. 287 F.2d 10, 16 (8th Cir. 1961); *Stevens v. Commissioner*, T.C. Memo. 1980–521. Thus, we hold that petitioners failed to prove that respondent erroneously deducted automobile expenses in the amount of $2,750 in computing petitioners' tax under sec. 1348.

[7]Petitioner does not argue that the termination of his *association agreement* in January of 1981 constituted his "separation from the service" on account of which he received the distribution. See sec. 402(e)(4)(A)(iii). We note that we do not read the phrase "on account of" to require strict coincidence in time of the date upon which the right to the distribution accrues and the date of separation. *Gittens v. Commissioner*, 49 T.C. 419, 423 (1968). Cf. *E.N. Funkhouser v. Commissioner*, 44 T.C. 178, 185 (1965), affd. 375 F.2d 1 (4th Cir. 1967). See also *Smith v. United States*, 460 F.2d 1005, 1016 (6th Cir. 1972), where the Sixth Circuit stated "The only time limitation in the statute requires that the total distributions payable to any employee be paid within one taxable year of the distributee so long as the payment shall be made on account of the separation from the service, and there is no requirement that the separation from the service occur before the distribution occurs or that both events must occur within the same year." Here the stipulated facts clearly show that the distribution to petitioner was made "on account of" the termination of his employment agreement on June 30, 1979, and petitioner does not suggest otherwise.

income under section 72 (relating to annuities). Sec. 402(a)(1).[8] However, Congress has accorded preferential tax treatment for reporting distributions where the recipient receives his entire interest from a qualified plan in a lump-sum distribution. Section 402(a)(2) allows capital gains treatment for lump-sum distributions attributable to pre-1974 active participation in a qualified employee trust.[9] Section 402(e)(1) provides a special 10-year averaging method for reporting the ordinary income portion of a lump-sum distribution.[10] The term "lump-

---

[8]Sec. 402(a)(1) provides as follows:

SEC. 402(a). TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities). The amount actually distributed or made available to any distributee shall not include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee. Such net unrealized appreciation and the resulting adjustments to basis of such securities shall be determined in accordance with regulations prescribed by the Secretary.

[9]Sec. 402(a)(2) provides in pertinent part:

(2) CAPITAL GAINS TREATMENT FOR PORTION OF LUMP SUM DISTRIBUTION.—In the case of an employee trust described in section 401(a), which is exempt from tax under section 501(a), so much of the total taxable amount (as defined in subparagraph (D) of subsection (e)(4)) of a lump sum distribution as is equal to the product of such total taxable amount multiplied by a fraction—

(A) the numerator of which is the number of calendar years of active participation by the employee in such plan before January 1, 1974, and

(B) the denominator of which is the number of calendar years of active participation by the employee in such plan,

shall be treated as a gain from the sale or exchange of a capital asset held for more than [appropriate holding period] * * *

[10]Sec. 402(e)(1) provides that:

SEC. 402(e). TAX ON LUMP SUM DISTRIBUTIONS.—

(1) IMPOSITION OF SEPARATE TAX ON LUMP SUM DISTRIBUTIONS.—

(A) SEPARATE TAX.—There is hereby imposed a tax (in the amount determined under subparagraph (B)) on the ordinary income portion of a lump sum distribution.

(B) AMOUNT OF TAX.—The amount of tax imposed by subparagraph (A) for any taxable year shall be an amount equal to the amount of the initial separate tax for such taxable year multiplied by a fraction, the numerator of which is the ordinary income portion of the lump sum distribution for the taxable year and the denominator of which is the total taxable amount of such distribution for such year.

(C) INITIAL SEPARATE TAX.—The initial separate tax for any taxable year is an amount equal to 10 times the tax which would be imposed by subsection (c) of section 1 if the recipient were an individual referred to in such subsection and the taxable income were an amount equal to $2,300 plus one-tenth of the excess of—

(i) the total taxable amount of the lump sum distribution for the taxable year, over

(ii) the minimum distribution allowance.

(D) MINIMUM DISTRIBUTION ALLOWANCE.—For purposes of this paragraph, the minimum distribution allowance for the taxable year is an amount equal to—

(i) the lesser of $10,000 or one-half of the total taxable amount of the lump sum distribution for the taxable year, reduced (but not below zero) by

(ii) 20 percent of the amount (if any) by which such total taxable amount exceeds $20,000.

(E) LIABILITY FOR TAX.—The recipient shall be liable for the tax imposed by this paragraph.

sum distribution," as defined in section 402(e)(4)(A), means a distribution from a qualified trust within 1 taxable year of the recipient which becomes payable to the recipient "on account of" the employee's death, disability, attaining age 59½, or separation from the service.[11] The phrase "separation from the service" is not defined in the Code or regulations. Consequently, the courts have looked to the language of the statute and its legislative history in construing the phrase so as to give effect to the intent of Congress. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 542–545 (1940), rehearing denied 311 U.S. 724.

The phrase "separation from the service" first appeared in the Code in 1942 when Congress enacted a provision allowing capital gains treatment for total distributions on account of the employee's death or other separation from the service.[12] The accompanying committee report stated that a "separation from the service" occurs when the employee retires or *severs his connection with his employer.* S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 607.[13]

---

[11]Sec. 402(e)(4)(A) provides in pertinent part:

(4) DEFINITIONS AND SPECIAL RULES.—

(A) LUMP SUM DISTRIBUTION.—For purposes of this section and section 403, the term "lump sum distribution" means the distribution or payment within one taxable year of the recipient of the balance to the credit of an employee which becomes payable to the recipient—

(i) on account of the employee's death,

(ii) after the employee attains age 59½

(iii) on account of the employee's separation from the service, or

(iv) after the employee has become disabled (within the meaning of section 72(m)(7))

from a trust which forms a part of a plan described in section 401(a) and which is exempt from tax under section 501 * * *

[12]The amendment to sec. 165 of the 1939 Code was enacted by sec. 162(a) of the Revenue Act of 1942, 56 Stat. 862. Sec. 165(b) stated in pertinent part:

SEC. 165. Employees' Trusts.

(b) TAXABILITY OF BENEFICIARY.—The amount actually distributed or made available to any distributee by any such trust shall be taxable to him, in the year in which so distributed or made available, under section 22(b)(2) as if it were an annuity the consideration for which is the amount contributed by the employee, except that if the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee *on account of the employee's separation from the service,* the amount of such distribution to the extent exceeding the amounts contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. [Emphasis added.]

[13]The Senate report provides in pertinent part:

"The provisions of the House bill with respect to section 165(b), concerning the taxation of the beneficiary of a trust which meets the requirements of section 165(a), have not been changed except to take care of the situation where an employee receives the total distributions that he is entitled to under the plan in one taxable year *on account of his separation from the service.* In such a case, it is provided that the amount of such distributions to the extent that it exceeds the

In 1954, Congress replaced section 165(b) with section 402(a)(2) retaining the provision for capital gains treatment for lump-sum distributions from qualified trusts on account of the employee's death or other separation from the service.[14] In 1974, the phrase "separation from the service" was moved from section 402(a)(2) to section 402(e)(4)(A)(iii) and is now part of the definition of lump-sum distribution. Section 2005 of the Employment Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, 1974–3 C.B. 156. See note 11 *supra*.

Relying on the language in the legislative history, this Court has consistently interpreted "separation from the service" to mean when an employee severs his connection with his employer. *Bolden v. Commissioner*, 39 T.C. 829 (1963); *Estate of Rieben v. Commissioner*, 32 T.C. 1205 (1959); *Oliphint v. Commissioner*, 24 T.C. 744 (1955), affd. on another point 234 F.2d 699 (5th Cir. 1956); *Estate of Fry v. Commissioner*, 19 T.C. 461 (1952), affd. per curiam 205 F.2d 517 (3d Cir. 1953); *Glinske v. Commissioner*, 17 T.C. 562 (1951). We note that the more recent court decisions construing "separation from the service" have involved distributions incident to corporate mergers, reorganizations, or complete liquidations where the employee, after receiving the distribution, continued employment for the employer that survived the reorganization, merger, or liquidation. We have taken the position that "separation from the service" occurs in this context only if the corporate reorganization, merger, or liquidation results in a substantial change in the makeup of employees. *Gittens v. Commissioner*, 49 T.C. 419, 424 (1968), adopting the interpretation of the Fifth

---

amounts contributed by the employee shall be considered a gain from the sale or exchange of a capital asset held for more than six months. For example, if under a profit-sharing trust, the total distributions to which an employee is entitled are paid to the employee in the year in which he retires or *severs his connection with his employer*, or to his widow if he dies during the course of his employment, the amount received by the employee or widow to the extent it exceeds the employee's contributions will be considered a gain from the sale or exchange of a capital asset held for more than six months. [Emphasis added.]"

[14]As originally adopted in 1954, sec. 402(a)(2), I.R.C. 1954, provided in pertinent part:

CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of *the employee's death or other separation from the service*, or on account of the death of the employee after his separation from the service, the amount of such distribution, * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months * * *

Circuit in *United States v. Johnson*, 331 F.2d 943 (5th Cir. 1964); *Gegax v. Commissioner*, 73 T.C. 329, 334 (1979). Compare *Smith v. United States*, 460 F.2d 1005, 1014–1015 (6th Cir. 1972). While this Court has never considered a fact situation precisely like the present case, we have consistently followed as a general guideline that separation from the service "requires a change in the employment relationship in more than a formal or technical sense." *Gittens v. Commissioner*, *supra*, 49 T.C. at 424. It is against this legislative history and these judicial precedents that we consider the present case.

Petitioner argues that the change in his employment status with the clinic from that of an employee to that of an independent contractor was a separation from the service within the meaning of section 402(e)(4)(A)(iii) even though he continued to perform the same services as a physician for the clinic after the change as he had performed before the change. Respondent disagrees. Respondent's position in this case is similar to the position taken in Rev. Rul. 81–26, 1981–1 C.B. 200. In that revenue ruling, the Commissioner ruled that the change of employment status from that of a common law employee to that of a partner was not a "separation from the service" within the meaning of section 402(e)(4)(A)(iii) because the employee did not retire or resign; nor was the employee discharged, but instead continued to render services in the ongoing business. Rev. Rul. 81–26, 1981–1 C.B. 200, 201, superseding Rev. Rul. 73–414, 1973–2 C.B. 144.

A revenue ruling of course merely represents the position of one of the litigants in this case, the Commissioner of Internal Revenue, and does not necessarily even represent the view of the Treasury Department. *Crow v. Commissioner*, 85 T.C. 376 (1985). As such, revenue rulings are not binding on either the Treasury Department or the courts. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971). However, revenue rulings may be helpful in interpreting a statute and may be considered on their own intrinsic merit and persuasiveness or lack thereof.

The parties have not cited and we have not found any case precisely like the instant case. The most analogous factual situation is one involving an employee in an accounting firm who was promoted to partner, and in that case the Claims

Court reached the same result as in Rev. Rul. 81–26, *supra*. *Ridenour v. United States*, 3 Cl. Ct. 128 (1983).

In *Ridenour*, the taxpayer was promoted from employee (or associate) to partner in a public accounting firm. The firm's profit-sharing plan provided that participants who became partners in the firm were no longer eligible to participate in the plan and that all amounts credited and vested to their accounts had to be distributed to them within 60 days after the end of the taxable year in which they became partners. Upon becoming a partner, the taxpayer received a distribution from the plan and argued that the distribution qualified for preferential tax treatment—capital gains treatment for pre-1974 amounts and 10-year averaging for the balance. In support of such treatment, the taxpayer contended that his distribution from the plan was a lump-sum distribution as defined in section 402(e)(4)(A) because it was made on account of his separation from the service. Recognizing that this was an issue of first impression, the Claims Court carefully reviewed the framework of the Code's retirement plan provisions, their legislative histories, and relevant administrative and judicial decisions. The Claims Court concluded that a common law employee's promotion to partner, by and of itself, does not constitute a "separation from the service" under section 402(e)(4)(A)(iii) and that, a fortiori, such a promotion from associate to partner of the firm does not. *Ridenour v. United States*, 3 Cl. Ct. at 139. Without retracing all of the ground traversed by the Claims Court's well-reasoned opinion, we agree with the analysis and the conclusion reached.

The taxpayer in *Ridenour* based his argument on the distinction between the common law meaning of employee and the self-employed, suggesting that "service" refers only to tasks an employee performs for his employer. The taxpayer asserted that the phrase "separation from the service" should be construed to include the termination of the common law employment relationship, such as when an employee is promoted to partner, because partners join together in carrying on a trade or business or profession. In dismissing this argument, the Claims Court stated "Common-law distinctions should not govern statutory interpretations if they would frustrate the objectives which pension legislation is designed to serve." *Ridenour v. United States*, 3 Cl. Ct. at 131, citing

*Moragne v. States Marine Lines*, 398 U.S. 375 (1970); *United States v. Silk*, 331 U.S. 704 (1947); and *NLRB v. Hearst Publications*, 322 U.S. 111 (1944). After an exhaustive review of the legislative history,[15] the Claims Court, in *Ridenour*, generally concluded that the distinction to be drawn is between one who continues to provide services and one who discontinues providing services, rather than upon the particular status of the person rendering the services. The Claims Court concluded that one who continues to provide services has not separated from the service within the meaning of section 402(e)(4)(A)(iii). In the instant case, petitioner presents an argument similar to that in *Ridenour* to support his position, and we find it equally unpersuasive.

Petitioner also appears to construe "separation from the service" as meaning simply a change in one's employment status for purposes of Federal employment taxes imposed by subtitle C of the Code. Petitioner submitted a letter from the Internal Revenue Service, dated August 28, 1981, which acknowledges that for purposes of the Federal employment tax provisions, the Service recognizes that nonshareholder physicians practicing at the clinic do not hold substantially similar positions as the employee physicians.[16] Petitioner contends that this letter supports his argument that becoming an independent contractor for Federal employment tax purposes, together with divesting himself of all economic interests

---

[15]See also *United States v. Johnson*, 331 F.2d 943 (5th Cir. 1964), and *Gittens v. Commissioner*, 49 T.C. 419 (1968), where this Court and the Fifth Circuit also traversed this same ground.

[16]Dr. Paul D. Lepor from the clinic requested United States Representative Bob Traxler to intercede on the clinic's behalf during an examination of the clinic by the Internal Revenue Service. This letter was in reply to Mr. Traxler's letter dated July 29, 1981, which is not part of the record. The letter provides in pertinent part:

"In the course of an audit the question of the employment tax status of non-shareholder doctors performing services for the Clinic was raised. As you are aware, section 530 of the Revenue Act of 1978 prevents the Service from assessing any employment tax liabilities with respect to these workers if certain conditions are met. Section 530 relief generally applies if the taxpayer did not treat an individual as an employee in the past and has a reasonable basis for not treating the individual as an employee. Under section 530(a)(3) of the Act, for years after 1978, the relief applies only if the appropriate federal tax returns are filed by the taxpayer consistent with the taxpayer's treatment of the individual as not being an employee, and only if the taxpayer has not, after 1977, treated any individual holding a substantially similar position as an employee.

"The Clinic has continuously treated its shareholder doctors as employees. Therefore, under section 530(a)(3) of the Act, the Clinic would not be entitled to section 530 relief, if the nonshareholder doctors hold substantially similar positions as the shareholder doctors. In applying section 530(a)(3) to the Clinic, the Service considered the Congressional intent (as expressed in the pertinent Committee Reports) that section 530 relief be granted liberally. After careful deliberation, the Clinic has been granted relief under section 530."

related to the clinic, amounts to a "separation from the service" even though he continued to provide the same services for the clinic before and after his change in employment status. That letter from the Internal Revenue Service related to special relief provided to employers by section 530 of the Revenue Act of 1978.[17] That special provision granted interim relief for employers involved in certain employment tax status controversies, by prohibiting the Internal Revenue Service for a period of time from applying any changed position or newly stated position or from reclassifying certain individuals as employees for purposes of Federal income tax withholding. S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 508. That narrow, specific relief provision for employers has nothing to do with the issue before the Court.

As in *Ridenour*, petitioner also cites Rev. Rul. 69–647, 1969–2 C.B. 100, to support his position. In Rev. Rul. 69–647, the Commissioner ruled that an employee who retired from full-time employment but continued to provide advisory opinions on an irregular basis to his former employer as an independent contractor, separated from the service upon his retirement from full-time service. Rev. Rul. 69–647, 1969–2 C.B. at 101. The ruling also determined that since the employer no longer had the right to exercise the direction and control necessary under the common law rules to establish an employer-employee relationship, such relationship did not exist for Federal employment tax purposes and the amounts paid to the taxpayer were not wages for withholding purposes. Rev. Rul. 69–647, 1969–2 C.B. at 101. Petitioner argues that the determinative factor for finding a separation from the service in Rev. Rul. 69–647 was the taxpayer's change in employment status for Federal employment tax purposes. We disagree. The change in employment status from employee to independent contractor was not controlling in Rev. Rul. 69–647, nor is it here.[18] See *Ridenour v. United States, supra*, 3 Cl. Ct. at 137, where that court stated:

---

[17]Sec. 530 of the Revenue Act of 1978, Pub.L. 95–600, 92 Stat. 2885.

[18]We note that respondent's revenue rulings on the matter of "separation from the service" under sec. 402 and its predecessors have been confusing, ambiguous, conflicting, and of little assistance to the courts in deciding cases arising thereunder. See *United States v. Johnson*, 331 F.2d at 949–951; *United States v. Haggart*, 410 F.2d 449, 453 (8th Cir. 1969); *United States v. Martin*, 337 F.2d 171, 175–176 (8th Cir. 1964). We do not find Rev. Rul. 69–647 intrinsically persuasive, and we agree with the Claims Court that it is distinguishable on its facts in any event.

Although, in this ruling, the Internal Revenue Service considered the common-law status as a factor, the key element in determining whether there had been a "separation from the service" was the fact that the employer was not exercising supervision over the taxpayer, nor requiring his compliance with detailed orders or instructions. In addition, there was no established work schedule, nor was it necessary for the employee to obtain the employer's permission to be absent from work. In other words, the employee was not obligated to work and only a minimal obligation to provide services existed.

Petitioner further attempts to distinguish *Ridenour* by contending that he has not received a promotion as the taxpayer in *Ridenour* received, but if anything, has taken a decrease in a true economic sense. Petitioner asserts that as an independent contractor, he earned considerably less than he earned as an employee. In addition, petitioner contends the profit-sharing plan in *Ridenour* could have provided for partners to continue their participation, but the clinic's pension and profit-sharing plans could not have so provided because nonemployees may not participate in corporate plans. Both of these distinctions are irrelevant or at best tenuous. Here, petitioner chose to sell his stock in the clinic, to terminate his employment agreement, and to precipitate the lump-sum distribution made to him while he remained with the clinic and continued to render services to the clinic under an association agreement. In *Ridenour*, the Claims Court based its decision on the fact that the taxpayer continued to provide services to his employer after the change in his employment status. We think that factor is determinative and should also control the result in this case.

This Court has previously determined that "separation from the service" does not occur unless the employee severs his connection with his employer. *Bolden v. Commissioner, supra; Estate of Fry v. Commissioner, supra.* Separation from the service requires a change in the employment relationship in more than a formal or technical sense. *Gittens v. Commissioner, supra.*

Whether an employee has severed his connection with his employer is a question of fact. In *Bolden v. Commissioner, supra,* an owner-employee who sold his business had not separated from the service because he contracted with the new owner to continue to advise the business. In addition, an employee who retired from service and no longer performed

services for his employer but continued to receive his full salary had not severed his connection with his employer. *Estate of Fry v. Commissioner, supra.*

In the instant case, petitioner terminated his employment agreement with the clinic on June 30, 1979, and executed an association agreement with the clinic on July 2, 1979. The services rendered by petitioner as a physician for the clinic did not change as a result of the change in petitioner's employment status. In fact, both his employment and his association agreement required petitioner to perform services at the clinic on a full-time basis. Moreover, nothing in the record indicates that petitioner's duties or responsibilities as a physician at the clinic diminished one iota as a result of becoming an independent contractor.

On the facts presented, we think it is clear that petitioner did not sever his connection with the clinic within the meaning of section 402(e)(4)(A)(iii) when he terminated his employment agreement on June 30, 1979, and entered into an association agreement with the clinic on July 2, 1979.

To treat such a technical change in employment status as a separation from the service would, in our opinion, contravene the congressional policy behind section 402(e)(4)(A) and its predecessors. Congress was not trying just to alleviate the effects of bunching of income whenever an employee receives a lump-sum distribution from a qualified plan *for any reason.* The congressional policy was more narrowly aimed at discouraging early distributions before retirement age and yet preserving portability of pension funds when an employee actually separates from the service of his employer before retirement age. Hence, the favorable tax treatment does not apply when qualified pension and profit-sharing plans are terminated because that could encourage abuses of early distributions unrelated to retirement purposes;[19] the favorable tax treatment applies to distributions narrowly restricted to situations where the employee, before retirement age, completely severs his connection with his employer as a result of death, disability, attaining age 59½ (usually for the self-employed), or separation from the service. See *Jennemann v. Commissioner,*

---

[19]Of course, a distribution upon plan termination may be a "qualifying rollover distribution" under sec. 402(a)(5)(D), and be rolled over into another qualifying plan.

67 T.C. 906, 910 (1977);[20] *Ridenour v. United States*, 3 Cl. Ct. at 136–137; H. Rept. 93–1280 (Conf.) (1974), 1974–3 C.B. 415, 510. As H. Rept. 93–1280 shows, Congress sought to treat the employee and the self-employed person (independent contractor, partner, etc.) the same, not differently. Favorable tax treatment for a distribution made on account of a true separation from the service fosters the congressional policy to protect the mobility of our work force, and to provide portability of pension funds. Where, as here, the individual continues to render services to the same business, there is no justification for the preferential tax treatment. A lump-sum distribution in that situation is not related to retirement purposes and could result in abusive situations where pension funds are bailed out prematurely, not for retirement purposes, but for investments, starting a new business, or whatever other personal reason the employee might have for wanting to get his money out of the pension plan through an early distribution. To permit preferential tax treatment in that situation would, in our opinion, be contrary to the restrictive statutory language of section 402(e)(4)(A), and contrary to the policy considerations underlying the statute.

Petitioner's change in employment status from that of an employee to that of an independent contractor did not constitute a separation from the service within the meaning of section 402(e)(4)(A)(iii). Thus, the distribution in the amount of $150,744 received by petitioner in July of 1979 was not a lump-sum distribution as defined in section 402(e)(4)(A), and, consequently, petitioner is not entitled to use the 10-year averaging method provided by section 402(e)(1) in reporting this distribution.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[20]See also *Addison v. Commissioner*, T.C. Memo. 1979–317.