ROGER N. MEUNIER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meunier v. Commissioner
Docket No. 24548-89
United States Tax Court
T.C. Memo 1991-446; 1991 Tax Ct. Memo LEXIS 495; 62 T.C.M. (CCH) 705; T.C.M. (RIA) 91446; September 11, 1991, Filed *495 Decision will be entered for the respondent. Roger N. Meunier, pro se. Barry J. Laterman, for the respondent. RAUM, Judge. RAUM
MEMORANDUM OPINION The Commissioner determined deficiencies in the income taxes of Roger N. Meunier (petitioner) for his 1981 and 1982 taxable years in the amounts of $ 49,738 and $ 698, respectively. Since petitioner has not contested some of the adjustments made by the Commissioner, the only remaining issue for decision is whether $ 200,000 received by petitioner in 1981 was part of the consideration for the sale of property, rather than prepaid interest ("points") to the extent of $ 40,000 and a consulting fee to the extent of $ 160,000. If that $ 200,000 was part of the sales proceeds, it was a capital item; on the other hand, if it represented "points" and a consulting fee, it was taxable as ordinary income. There is no dispute between the parties in respect of legal principles; the controversy revolves around the facts. And the burden of proof is upon petitioner. The case was submitted on the basis of a stipulation of facts. However, the fact that a case is fully stipulated does not change the burden of proof. See Zarin v. Commissioner, 92 T.C. 1084, 1089 (1989), *496 revd. on other grounds 916 F.2d 110 (3rd Cir. 1990); Reinhardt v. Commissioner, 85 T.C. 511, 516 n.6 (1985); Service Bolt & Nut Co. Profit Sharing Trust v. Commissioner, 78 T.C. 812, 819 (1982), affd. on other issues 724 F.2d 519 (6th Cir. 1983); Estate of Luehrmann v. Commissioner, 33 T.C. 277, 281 (1959), affd. 287 F.2d 10, 16 (8th Cir. 1961). As set forth in Rule 122(b), Tax Court Rules of Practice and Procedure: (b) Burden of Proof: the fact of submission of a case, under paragraph (a) of this Rule, does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof.
During the years involved petitioner was a resident of New Hampshire. When the petition herein was filed he resided in Maine. He has had extensive business experience in building construction and real estate development, including the construction of a shopping center as well as industrial and municipal buildings. At one time he had also operated a building supply firm. In 1973, petitioner acquired title to a parcel of land *497 in Claremont, New Hampshire, not far from the Vermont border. In 1973 and 1977, he constructed two buildings on that parcel, one of which was suitable for use as a warehouse and the other for manufacturing. In 1981, when both buildings were under lease to Hampshire Manufacturing Corporation (Hampshire), petitioner was experiencing financial difficulties. The rentals appear to have been substantially below market, and were estimated at "approximately 50% of fair market rents." Petitioner entered into an agreement with Hampshire dated July 15, 1981, to purchase the outstanding leases for $ 150,000. The property, land and buildings leased to Hampshire, was subject to various obligations. Two of petitioner's promissory notes in the aggregate amount of $ 2,350,000 were secured by what appears to have been a first mortgage to a bank, and payment of these notes was further secured by a separate assignment of lease and rents. In addition, petitioner was obligated to the bank on a 25-year note in the amount of $ 120,000, and a $ 161,000 demand note, secured by second and third mortgages, respectively. All of the notes called for monthly payments. Further, the property was encumbered *498 by a number of liens and attachments, and was possibly also potentially chargeable with obligations for unpaid taxes, water and sewer charges, etc. In short, petitioner appeared to be in a financial bind. The solution to petitioner's problems was the sale of the property to a newly established tax shelter limited partnership in which petitioner would be the sole general partner and the limited partners would supply an infusion of $ 900,000 in exchange for their limited partnership interests. The plan was worked out by petitioner's lawyer, A. Jeffry Taylor (Taylor), in conjunction with an accountant, William J. Medlin (Medlin), whose firm was retained by petitioner to provide accounting and tax information as well as financial planning in connection with the project. Both Taylor and Medlin's firm had their offices in Vermont. Pursuant to the plan, Claremont Associates Limited Partnership (CALP) was to be created as a Vermont limited partnership, with petitioner as the sole general partner. Medlin undertook to solicit potential Vermont investors as limited partners. Taylor prepared a detailed prospectus for that purpose, entitled "Confidential Memorandum" (Memorandum), offering *499 to sell $ 900,000 of limited partnership interests ("units") in CALP at $ 36,000 per unit. The Memorandum, undated, makes clear that it is addressed to investors of means in the upper tax brackets, who could afford a complete loss of their investment. It states that CALP proposes to purchase from petitioner, the general partner, the property subject to the secured notes held by the bank. The typewritten purchase price of $ 3,500,000 in the copy of the Memorandum submitted to the Court had been stricken out by hand, and the amount of $ 3,150,000 in handwriting was substituted. There is no evidence when the change was made, or whether it appeared in the copies that were presented to potential investors, or even whether it was made only for purposes of submission to this Court. The Memorandum undertakes to set forth the use of the $ 900,000 proceeds. Among other things, it refers to "certain fees to the General Partner" and "approximately $ 205,000 of obligations of the General Partner for tax liens and other encumbrances on the properties." It also refers to other costs including $ 70,000 fees to Medlin's accounting firm and $ 40,000 legal fees to Taylor, as well as a $ 150,000 *500 payment to Hampshire for termination of its leases. CALP was in fact organized as a Vermont limited partnership, with a partnership agreement which presumably adopted the language of the limited partnership agreement form attached to the Memorandum. Petitioner was named therein as "the 'General Partner'." He was given "exclusive control over the business of the partnership" in extensively described detail, limited only by certain express prohibitions such as confessing judgment against the partnership, none of which appears to have any relevance here. An agreement of sale of the property, dated September 1, 1981, was then entered into between petitioner as "Seller" and CALP as "Purchaser." It provided in part as follows: 3. Purchase price - The price is $ 3,167,281.90, payable as follows: (a) $ 105,000.00 in cash or bank-issued check on the delivery of the deed as hereinafter provided; (b) $ 2,512,281.90 by taking title subject to mortgages now liens on the premises in that amount, held by Indian Head National Bank and listed on Scheduled [sic] A * attached to this agreement, which mortgages, the Purchaser assumes and agrees to pay and to save the Seller harmless *501 from any liability on the notes for which the said mortgages were given as security; and (c) $ 550,000.00, by the Purchaser or assigns, executing, acknowledging and delivering to the Seller a note satisfactory to the Seller secured by a purchase money mortgage on the premises subordinate and junior to the aforesaid mortgages held by the Indian Head National Bank * * * * * * 7. Satisfaction of existing liens and attachments - The amount of any unpaid taxes, assessments, water charges and sewer rents, and other liens and attachments which the Seller is obligated to pay and discharge, with interest and penalties, * * * will be allowed to the Purchaser out of the balance of the purchase price. If at the date of closing title there may be any other liens or encumbrances other than those set forth in attached Schedule B * which the Seller is obligated to pay and discharge, the Seller shall use any portion of the balance of proceeds to be delivered at closing to satisfy the same, * * * * * * 10. Closing - The deed *502 shall be delivered at the offices of the Concord National Bank, Concord, New Hampshire, on Tuesday, September 15, 1981, beginning on or about 1:30 p.m. * * * 13. Completeness of contract - All understandings and agreements heretofore had between the parties hereto are merged into this contract, as respecting the conveyance of the subject premises, which contract alone fully and completely expresses the agreement of the parties. * * * 15. Oral modification - This contract may not be changed or terminated orally. * * * 19. At the closing, the Purchaser agrees to pay to the Seller the sum of $ 40,000 as "points" representing compensation to the Seller solely as a charge for the use or forbearance of money, and as an inducement for the extension of credit by the Seller, and not as payment to the Seller for the performance of any services by the Seller or for any of the costs of closing. 20. The purchaser agrees to purchase the outstanding leases of the premises held by Hampshire Manufacturing Corporation and assume the Seller's obligation under the terms of the Agreement between the Seller and Hampshire dated July 15, 1981.
The record also contains a document *503 that purports to state the sources and uses of the cash provided at the closing of the sale as follows: Hampshire Manufacturing facility
Closing Statement
9/28/81
Cash
$  105,000.00 Points
40,000.00 Consulting Contract
160,000.00 Cash owed to Roger N. Meunier
$  305,000.00 Cash paid
(290,000.00)
Balance of Purchase Price
$   15,000.00 Transfer stamps paid by Roger N. Meunier to
be reimbursed by Claremont Associates
14,915.00 Repayment of credit on $ 161,000 note
4,828.78 Balance owed to Roger N. Meunier as of
$   34,743.78 9/28/81
Disbursement of Proceeds
from Sale of Hampshire Manufacturing facility
Proceeds
$ 290,000.00
Interest
451.11
$ 290,451.11
Disbursements
Edward Tenny, Esquire (attorney for GMC Hardwood, Inc.)
$   8,000.00
Internal Revenue Service
23,866.09
Michael Rosen, Esquire (attorney for Shawmut-Needham Bank)
25,000.00
Michael Rosen, Esquire (attorney for Shawmut-Needham Bank)
30,000.00
Howard Dunn, Esquire (attorney for City Bank & Trust)
7,500.00
Department of Employment Security
5,000.00
Thomas Sasdi
4,767.51
W. John Funk, Esquire (attorney for Clifford Broker)
12,918.88
Charles Spanos, Esquire (attorney for LaValley
1,017.35
Building Supply, Inc.)
Peter Burling, Esquire (attorney for Norman Bergeron)
1,500.00
Louis Elliott, Esquire (attorney for City of Claremont)
17,500.00
Jack S. White, Esquire (attorney for Industrial
6,218.08
National Bank of Rhode Island)
Upton, Sanders & Smith
16,246.33
Vincent Nardi, Esquire
1,414.53
William Medlin
5,000.00
Certificate of Deposit (Escrow Account)
100,000.00
Sullivan County Registry of Deeds
14,915.00
Roger N. Meunier (repayment of credit on
4,828.78
Indian Head $ 161,000 note)
Roger N. Meunier
4,758.56
$ 290,451.11
*504 CALP issued to petitioner a Form 1099-NEC (Nonemployee Compensation) for 1981. [1] That form contained a box entitled "Fees, commissions, and other compensation," in which the figure $ 203,353.01 was inserted. However, on his income tax return for 1981, petitioner reported only $ 3,353.01 of this amount as compensation. He took the position that the remaining $ 200,000 was a portion of the proceeds of the sale of the property, and accordingly reported the sale price of the building as $ 3,367,281.90 instead of $ 3,167,281.90. The Commissioner determined that $ 160,000 of the $ 200,000 amount was includable in gross income as "Consulting Fees," and that the remaining $ 40,000 was similarly includable in petitioner's gross income as "Interest Income 'Points'." We sustain the Commissioner. At the heart of petitioner's position is his contention *505 that he was not really the general partner of CALP, that he was only its nominal general partner, that the real general partner was Medlin, and that the documentary materials attributing $ 200,000 of ordinary income to him were "carefully" drafted by Taylor on Medlin's behalf so as to obscure the real facts. And when the real facts are examined, his argument continues, it will be found that the real purchase price for his property was not $ 3,167,281.90, as set forth in the agreement of sale, but was actually $ 200,000 more, namely $ 3,367,281.90, that he rendered no services for which $ 160,000 consulting fees were paid to him or on his behalf, and that he in fact did not receive any $ 40,000 in prepaid interest or "points." Petitioner's briefs contain a hodgepodge of arguments, which turn largely upon a correct understanding of the facts. However, the burden is upon petitioner to present evidence to support his position. And, as we pointed out near the beginning of this opinion, supra p. 2, that burden is not changed even though the case is submitted on a stipulation of facts. To prevail, petitioner must present evidence or facts in the stipulation that are sufficient to *506 carry that burden. At the outset, we have several general observations to make about the stipulation and petitioner's presentation. In the first place, the stipulation itself is skimpy, and primarily dumps exhibits upon us from which we are required to extract the facts. The task here has been exasperating, not only because some of the figures in the exhibits do not seem to mesh with one another or do not otherwise "add up," but also because some of the exhibits make reference to schedules, etc., allegedly attached to them but which were not in fact attached to the exhibits presented to us. [2] We can't tell whether such attachments would be necessary or at least helpful to a reasonably accurate evaluation of the factual matters involved. In the second place, petitioner's briefs from time to time make reference to alleged facts that are not in the record at all. *507 Petitioner's contention that the controverted $ 200,000 item was merely part of the purchase price rather than $ 40,000 "points" and $ 160,000 fees is squarely in conflict with the documentary materials in evidence. The agreement of sale explicitly fixes the sale price at $ 3,167,281.90, not $ 3,367,281.90. That agreement also provides in paragraph 19 that the purchaser "agrees to pay the Seller the sum of $ 40,000 as points." Further, the closing statement sets forth not only the $ 40,000 component but also the $ 160,000 fee component described as "Consulting Contract." Also, the nonemployee compensation Form 1099 (NEC) reports $ 203,353.01 as "Fees, commissions, and other compensation" paid to petitioner, an amount which without dispute includes the $ 200,000 item in controversy. Petitioner does indeed bear a heavy burden to overcome what thus appears in the documents before us. Cf. Lucas v. Commissioner, 58 T.C. 1022, 1032 (1972). We hold that he has not discharged that burden. Petitioner's principal contention is that the documents leading to the attribution of the $ 200,000 as ordinary income to him (rather than capital gain) do not reflect the true *508 state of affairs, and he places the blame upon his accountant Medlin and his attorney Taylor. He states that Medlin, whose firm owned 1.5 units of limited partnership interest in CALP (a 5.94 percent interest), had a conflict of interest that made it advantageous for him to treat the $ 200,000 as consisting of fees and interest that might be claimed as a deduction by CALP. [3] He relies heavily upon his argument that he was only the "nominal" general partner and that Medlin was the real general partner, who controlled CALP's affairs and who was thus in a position to characterize the $ 200,000 to petitioner's disadvantage. *509 Petitioner attempts to make much of the fact that, as stated in a letter from Taylor, the partnership checkbook would be in the custody of Medlin's firm, accountants for the partnership, and that "you [petitioner], as general partner, will submit to [the firm] orders for the payment of bills owed by the partnership or for the issuance of bank drafts or for other purposes." Petitioner's argument that he was thus only a figurehead is fully contradicted by the following sentence in the same letter to the effect that Medlin's accounting firm "will be acting in a ministerial capacity in this regard with full recognition of your rights and duties as general partner to overall management and control of the partnership's business." Moreover, Taylor had previously sent to petitioner a comprehensive letter dated August 6, 1981, spelling out in detail the organization of CALP, the preparation of the prospectus or Confidential Memorandum, petitioner's retention of Medlin's firm "to provide accounting and tax information and advice and professional financial planning and other assistance with regard to the formation of * * * [CALP], the solicitation of potential investors as Limited Partners, *510 and accounting, tax and financial assistance following" CALP's acquisition of petitioner's property. A number of other details were also set forth. Petitioner was referred to as "the prospective General Partner." The concluding paragraph of the letter requested petitioner to initial and return an enclosed copy of the letter if it "sets forth the general terms of our agreement with you." Petitioner in fact signed his name in full on the blank space adjacent to the typed word "AGREED" below. The prospectus or Confidential Memorandum prepared for use in selling limited partnership interests in CALP identifies petitioner as the general partner and discloses that "THIS OFFERING INVOLVES * * * SUBSTANTIAL FEES TO THE GENERAL PARTNER." It repeats the same thought some 20 pages further on, stating that "The General Partner will receive substantial fees and profits in connection with this transaction." It had meanwhile stated that "the General Partner has the sole responsibility and authority for the management and administration of the Partnership's business." It is quite true, as emphasized by petitioner, that the Memorandum does state that the role of the General Partner, for the most *511 part, will be a "passive" one, but adds immediately thereafter that he will devote as much time to CALP's business "as in his judgment is reasonably required for the conduct of the business of the partnership." Further, the fact that petitioner's role as general partner was indeed not a "passive" one is suggested by Medlin's February 19, 1982 report to the limited partners in which he stated that "The General Partner, Roger Meunier, has and is currently devoting many hours to the management of the project and the securance [sic] of tenants." Bearing in mind that the burden of proof was upon petitioner, it is far from clear on this record that petitioner did not render any services for his $ 160,000 fee, as contended by him. As to the $ 40,000 prepaid interest or points component of the $ 200,000 item, the contract of sale specifically provided therefor in paragraph 19 thereof, set forth above at p. 7. Considering the fact that CALP was to become indebted to petitioner on a new $ 550,000 note, the provision in the contract for "points" is certainly not beyond some reasonable explanation. Petitioner, an experienced businessman, signed that contract, and absent any evidence to the *512 contrary, we find it difficult to accept any contention from him that it did not reflect the parties' agreement. Moreover, the closing statement plainly sets forth the $ 40,000 interest component as well as the $ 160,000 consulting fee. In view of what appears in the record it is quite understandable that the Commissioner treated the $ 200,000 not as capital gain, but as ordinary income to petitioner. The burden of proof was upon petitioner to show otherwise. At most, he has merely raised doubts. The matter cries out for further clarification if he is to prevail. Conceivably, he might have taken the witness stand and subjected himself to cross-examination. And he might have called Medlin and Taylor, even possibly as hostile witnesses. If the facts were fully developed we might have reached a different result. But, in the present state of the record, we must hold against petitioner for failure to carry his burden of proof. One final aspect of this case requires comment. Although petitioner recognizes that the agreement of sale formally fixes the purchase price at $ 3,167,281.90, as provided in paragraph 3 thereof, he calls attention to paragraph 7, which he seems to contend *513 somehow or other increases the purchase price. The relevant provisions of paragraphs 3 and 7 are set forth above at p. 6. Paragraph 7 is concerned with certain debts of petitioner that had apparently contributed to his financial problems. And the prospectus or Confidential Memorandum reveals that out of the funds to be received from the limited partners, CALP "expects to pay approximately $ 205,000 to creditors of the General Partner holding security interests in the properties by involuntary attachment or consentual [sic] mortgage deed by the General Partner." Paragraph 7 of the agreement of sale did not require that the payment of these personal debts of petitioner be added to the purchase price as petitioner suggests. Indeed, it appears to indicate just the opposite. Whatever that troubling language was really intended to mean, it would appear to indicate that, to the extent that CALP does pay petitioner's creditors with the cash required to be paid as part of the purchase price pursuant to paragraph 3 (i.e., $ 105,000), the purchase price would be reduced accordingly. In any event, it certainly does not increase the purchase price. We have considered and rejected various *514 other contentions made by petitioner, but think that they are not worthy of discussion. Decision will be entered for the respondent. Footnotes
*. Neither Schedule A referred to paragraph 3(b) nor Schedule B referred to in paragraph 7 was in fact attached to the copy of the agreement in evidence.↩
1. There is no other Form 1099 from CALP to petitioner in the record, nor is there any evidence that any other Form 1099 from CALP for 1981 was ever issued in respect of petitioner.↩
2. Thus, the contract of sale, Exhibit 4-D, refers to "Schedule A attached" (p. 2) and "the attached Schedule B" (p. 3). Exhibit 8-H states that petitioner has "agreed to the basic financial structure of [CALP] as set forth on Exhibit A attached to this letter." (pp.2-3) Exhibit 11-L refers to an accompanying Balance Sheet" of CALP. Exhibit 12-L lists 6 different items stated to be "enclosed," at least some of which could be informative or helpful to an understanding of the factual picture. Not even one of the alleged foregoing attachments, accompanying documents, or enclosures, was made part of the record in this case. Moreover, 2 pages (7 and 9) of Exhibit 3-C (the Confidential Memorandum) are tantalizingly missing from the copy in evidence.↩
3. A deduction was in fact claimed by the partnership based in part on the $ 200,000 set up on its books in 1981 as a liability to petitioner. It was disallowed in the course of the IRS audit of CALP on the ground that it was a nondeductible amount paid or incurred to organize a partnership (citing sec. 709 of the Internal Revenue Code↩), and that it was not shown to be an ordinary and necessary expense allowable under sec. 162 of the Code. Petitioner has argued here that consistency requires that he should not be chargeable with the amount disallowed to CALP. However, to the extent that the disallowance to CALP was based upon expenses incurred in its organization, there is nothing inconsistent in treating such amounts as income to the recipient. And to the extent that the disallowance as an ordinary and necessary expense was based on failure to present evidence, the same burden of presenting evidence rests upon petitioner here. He cannot use the failure to present evidence in the case of the partnership as ground for establishing that the evidence, if produced, would support him here. Moreover, the parties here have stipulated that "The deductions claimed by CALP for consulting fees to petitioner were subsequently allowed to CALP by respondent."