WEBSTER LAIR AND PEARL LAIR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8364-88.    Filed November 6, 1990.

*Bob A. Goldman,* for the petitioners.
*Michael A. Urbanos* and *Robert F. Cunningham,* for the respondent.

## OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in income tax and additions to tax against petitioners, Webster Lair and Pearl Lair, husband and wife, for the calendar years 1984 and 1985 in the following amounts:

| Year | Deficiency | Sec. 6653(a)(1) [1] | Sec. 6653(a)(2) | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|
| 1984 | $21,480 | $1,340 | * | $5,370 |
| 1985 | 294 | 161 | * | --- |

*50 percent of the interest due on $26,793 for 1984 and $3,226 for 1985.[2]

The case was submitted on the basis of a stipulation of facts and accompanying exhibits. Webster Lair alone participated in the transactions involved; he will be referred to herein as petitioner or Webster. The principal issue is whether petitioner's payment of $141,000 to a bank in 1984 pursuant to a guarantee agreement of June 14, 1984, on behalf of his son, Paul, was deductible in 1984 as a bad debt under section 166 of the Code and section 1.166-9(e), Income Tax Regs. Petitioners resided in Emmons, Minnesota, when they filed the petition in this case.

Up until his retirement, Webster had been engaged in the business of farming. The stipulation does not disclose precisely when he retired. However, the returns for 1984 and 1985 accompanying the stipulation state his "occupation" as "retired." No other returns are before us. The record does indicate that the farming operations were conducted by him until 1977, and then until 1979 by him and his two sons, David and Paul. The record further indicates that thereafter, until March 1983, the farming business was conducted by a partnership consisting of David and Paul, and beginning in March 1983 by Paul alone. To the extent that the time of Webster's retirement may be thought to be significant, the burden of proof was upon petitioners and they must bear the consequences of their failure to carry it.

For many years, Webster had been a customer of First Northwestern National Bank, which later became Norwest

---

[2] These amounts appear to reflect both the adjustments determined by the Commissioner and disputed by petitioners as well as those determined by the Commissioner and agreed to by petitioners.

Bank Albert Lea, National Association (the bank). He borrowed money from the bank to finance his farming business, and his debt was carried under the name Webster Lair until March 29, 1977. On that day, the loan was paid off and a loan established "under the title of Webster Lair and Sons." On April 25, 1979, "the loan was renewed under the title of Lair Brothers (David and Paul Lair)."[3] On April 21, 1981, Webster signed a guarantee agreement with the bank in which he guaranteed the payment of "all present and future debts" of the borrower (identified as "Lair Brothers") up to a principal amount of $300,000. The parties have stipulated that "The loan to Lair Brothers was renewed by Norwest Bank on April 23, 1980, March 11, 1981 and in April of 1982." Although the stipulation uses the word "loan" throughout, other materials in the record indicate that until 1984 there was not a specific loan, but rather a line of credit for the year involved with an anticipated aggregate amount or possibly a ceiling for that year. Similarly, the words "renewed" or "renewal" were undoubtedly used in the sense that the amount still outstanding at time of the "renewal" became part of a new authorized line of credit. The record fails to contain even a single document in which the borrower became obligated to the bank. Again, to the extent that the terms of the loan or line of credit setting forth the obligations of the borrower may be significant, petitioners must bear the consequences of the inadequacy of the record. The burden of proof was upon them—a burden that is not affected by submission of the case under our Rule 122 on a stipulated record.[4]

As of March 1983, David was no longer involved in the farming business, which was then carried on by Paul alone.

---

[3]Although the stipulation speaks of the loan as "renewed" on Apr. 25, 1979, "under the title of Lair Brothers (David and Paul Lair)," bank records (the Agricultural Credit Analysis Report dated April 1978) indicate that the borrower had already become "Lair Brothers" in April 1978.

[4]Rule 122(b) provides:

(b) Burden of Proof: The fact of submission of a case, under paragraph (a) of this Rule, does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof.

See *Zarin v. Commissioner*, 92 T.C. 1084, 1089 (1989), revd. on another issue 916 F.2d 110 (3d Cir. 1990); *Reinhardt v. Commissioner*, 85 T.C. 511, 516 n. 6 (1985); *Service Bolt & Nut Co. Trust v. Commissioner*, 78 T.C. 812, 819 (1982), affd. on other issues 724 F.2d 519 (6th Cir. 1983); *Estate of Luehrmann v. Commissioner*, 33 T.C. 277, 281 (1959), affd. 287 F.2d 10, 16 (8th Cir. 1961).

The parties have stipulated that the loan to the Lair Brothers partnership "was renewed in the name of Paul Lair in March of 1983." The records of the bank disclose that this loan or line of credit was to run for the annual period "2-83 to 2-84," and that there was a "Maximum Credit [of] $340,000 anticipated to be outstanding at any one time." As was the case in all prior loans or lines of credit, the borrower's obligation was supported by collateral of various items of personal property relating to the farm, e.g., livestock, crops, machinery, and equipment. The real estate was owned by Webster and leased to Paul at an annual rent of $40,000, but was not part of the security supporting the borrower's obligation.

The record does not disclose that there was any comparable "renewal" in 1984 of the 1983 "loan" to Paul by the bank, and, as found hereinafter, Paul did not continue to farm the land after the close of the 1983-84 farming year. Also, there seem[5] to be indications of economic difficulties at that time relating to farming, at least as they affected Paul's farming operations. And the stipulation discloses that in 1984, "petitioners cash-rented the same farm land rented to Paul Lair to an unrelated party for $56,200.00 annual rent." Since the farming year for petitioner's farm appears to run from late winter or early spring to the comparable time of the following calendar year, it would appear that Paul had ceased farming no later than April 1984. Petitioners have not shown otherwise.

In 1984, there remained an unpaid balance due to the bank on Paul's 1983 loan. On June 14, 1984, Webster guaranteed Paul's 1983 indebtedness to the bank. Unlike Webster's prior 1981 guarantee (the only other guarantee by Webster in the record),[6] which was limited to a specified maximum principal liability in the rounded figure of $300,000, the 1984 guarantee was limited to the specific

[5]The stipulation of the parties is exasperatingly vague and unsatisfactory in many respects. In an attempt to extract significant relevant facts, bearing in mind that the burden of proof was upon petitioners, we have of necessity used such imprecise terms as "seems" or "appears" throughout this opinion. As indicated several times herein, the burden of proof was upon petitioners and to the extent that they have failed to carry it, they must suffer the consequences.

[6]The parties have stipulated that certain records of the bank "indicate that the bank *felt* that the loans from April 1978 forward were always under a guarantee of Webster Lair." (Emphasis supplied.)

principal amount of $178,059.88. Webster thus appeared to guarantee only the amount of the then outstanding indebtedness rather than an amount that might thereafter be owed during the year under a line of credit. This circumstance reinforces our conclusion that Paul was no longer farming the land, at least from the start of the 1984 farming season no later than April 1984. We so find as a fact.

On June 14, 1984, the day that Webster executed the foregoing guarantee, he made a $6,000 payment on the loan account. Apparently other payments from undisclosed sources during the following period of approximately 2½ months had reduced the loan to some extent, and on September 26, 1984, the loan was renewed for $152,874.35. Later that year, in response to demands by the bank for payment pursuant to the June 14, 1984, loan guarantee, Webster made two payments on the loan account, $35,000 on November 6, 1984, and $106,000 on December 28, 1984— a total of $141,000.

Petitioners have stipulated that "Petitioners did not receive any payment in the form of cash or property from David or Paul Lair for guaranteeing the loans in 1981 and 1984, and did not receive any payment in the form of cash or property from David or Paul Lair for any guarantee from 1979 forward."

On Schedule D of their 1984 return, petitioners claimed a short-term capital loss of $141,000, the amount of Webster's two payments to the bank on his June 14, 1984, guarantee of the bank's loan to his son Paul. Among other adjustments, the Commissioner disallowed the $141,000 deduction. At issue is the correctness of such disallowance as well as the additions to tax determined by the Commissioner.

1. *The $141,000 deduction.* In deducting the $141,000 on Schedule D of their 1984 return as a short-term capital loss from sale or exchange of a capital asset held for not more than 6 months, petitioners were obviously claiming the deduction under section 166(d)(1)(B) as a nonbusiness bad debt. The relevant provisions of section 166 are set forth in the margin.[7] Subsection (d)(1)(B) provides in effect that

---

[7]SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

where a nonbusiness bad debt becomes worthless within the taxable year, the resulting loss is to be treated as a short-term capital loss.[8]

Although petitioners continue to defend their position on brief that they were entitled to deduct the payments as a nonbusiness bad debt, they alternatively argue that they are entitled to the deduction as a business bad debt as well as a nonbusiness bad debt. They cite section 1.166-9(d), Income Tax Regs. Their argument is hopelessly confusing. Section 1.166-9(d) is merely a limitation on deductions claimed under section 1.166-9(a) and (b). Section 1.166-9(a) is concerned with allowable deductions for worthless business debts, and section 1.166-9(b) provides for deductions of worthless nonbusiness debts which, however, arise out of a transaction entered into for profit. In setting forth the limitations upon 9(a) and (b), section 1.166-9(d)(1) describes both types of debts, and, in attempting to address petitioners' contentions, we will for convenience refer to section 1.166-9(d), relied upon by them, rather than to the operative provisions of section 1.166-9(a) and (b), which they do not

---

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

    *    *    *    *    *    *    *

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

    *    *    *    *    *    *    *

(d) NONBUSINESS DEBTS.—
    (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
        (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
        (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
    (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
        (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
        (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[8]The 6-month short-term capital loss period had previously been 1 year, but the time period was reduced to 6 months by sec. 1001(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011, effective for property acquired after June 22, 1984, and before Jan. 1, 1988. Thereafter the holding period again became 1 year. As will be shown shortly hereinafter, the property here, Paul's debt to Webster, was not acquired by Webster until he made the $141,000 payments in November and December 1984. However, there is no controversy between the parties as to which period (6-month or 1-year) is applicable.

even mention. To the extent relevant to petitioners' position, section 1.166-9(d) is set forth in the margin.[9]

Preliminarily, it is important that the status of the guarantor upon making payment to the lender on the guarantee be clearly understood. It has been well established for many years that the guarantor immediately becomes the creditor of the borrower to the extent of the payment on the guarantee. The law was summarized by the Supreme Court in *Putnam v. Commissioner,* 352 U.S. 82, 85 (1956):

The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. [Emphasis in original; fn. ref. and citations omitted.]

Plainly, Webster became Paul's creditor upon making the $141,000 payments to the bank in 1984. The parties have implicitly assumed that such debt became totally worthless in 1984—a questionable assumption. The Commissioner does not seem to have challenged such worthlessness for 1984, and we do not consider it here.

We put to one side for the moment consideration of whether the record establishes the necessary factual foundation for petitioners' alternative contention relating to a business bad debt deduction. For, regardless of whether the deduction is claimed as a business bad debt (section 1.166-9(a)) arising out of Webster's trade or business or as a nonbusiness bad debt (section 1.166-9(b)) resulting from a transaction which he entered into for profit, the deduction must be disallowed by reason of section 1.166-9(e), Income Tax Regs. Section 1.166-9(e) provides:

(e) *Special rules—*(1) *Reasonable consideration required.* Treatment as a worthless debt of a payment made by a taxpayer in discharge of part or all of the taxpayer's agreement to act as a guarantor, endorser, or

---

[9]Sec. 1.166-9(d). *Certain payments treated as worthless debts.* A payment in discharge of part or all of taxpayer's agreement to act as guarantor, endorser, or indemnitor of an obligation is to be treated as a worthless debt only if—

(1) The agreement was entered into in the course of the taxpayer's trade or business or a transaction for profit;

(2) There was an enforceable legal duty upon the taxpayer to make the payment * * *; and

(3) The agreement was entered into before the obligation became worthless * * * .

indemnitor of an obligation is allowed only if the taxpayer demonstrates that reasonable consideration was received for entering into the agreement. * * * However, consideration received from a taxpayer's spouse or any individual listed in section 152(a) *must be direct consideration in the form of cash or property.* [Emphasis supplied.]

This regulation was promulgated undoubtedly to reflect the views of the House Ways and Means Committee report relating to the bill which became the Tax Reform Act of 1976. H. Rept. 94-658 at 177 (1975), 1976-3 C.B. (Vol. 2) 701, 869. The regulation is obviously a limitation on all the other provisions of section 1.166-9 which might otherwise be applicable. It precludes any deduction for a worthless debt by a guarantor where the debtor is the spouse or any other relative or member of the guarantor's household, as listed in section 152(a), unless the guarantor has received "direct consideration in the form of cash or property" for entering into the agreement of guarantee. A "son" is included in the list set forth in section 152(a). See sec. 152(a)(1). The regulation was obviously intended to make unavailable a bad debt deduction (whether business or nonbusiness) where the guarantor was in substance gratuitously benefiting a member of a specified group, which consists of persons who could reasonably be considered as natural objects of the guarantor's bounty. See H. Rept. 94-658 at 177 *supra.* Cf. General Explanation of the Tax Reform Act of 1976, prepared by the Staff of the Joint Committee on Taxation at 157, 158 (1976), 1976-3 C.B. (Vol. 2) 145-146. Petitioners do not challenge the validity of the regulation, but contend in effect that its conditions are satisfied here.

Petitioners argue that "At the time of the signing of the initial guarantee, [Webster] received rental agreements and rental payments from his sons," and that "This meets the cash or property requirements necessitated by the Regulations." They then argue further that "Subsequent guarantees are really continuations of the initial guarantee so that the requirement of new consideration in the form of cash is not essential."

In the first place, Webster's June 14, 1984, guarantee agreement was not a "continuation," except in a loose sense, of any prior agreement. It established Webster's newly undertaken specific liability to the bank in the

amount of $178,059.88 as guarantor of the balance of Paul's then-outstanding indebtedness to the bank incurred by Paul pursuant to the 1983 loan. Indeed, the only prior guarantee agreement in the record is the one of April 21, 1981, which related to the debts of the borrower, identified as "Lair Brothers," up to a principal amount of $300,000. Although it is quite true that the bank "felt" that the loans from April 1978 forward were always under a guarantee by Webster (see *supra* note 6), this is hardly proof that there was in fact a binding agreement to that effect. The bank did obtain a limited guarantee in 1981 and the guarantee in the specific amount of $178,059.88 on June 14, 1984, thereby indicating that the bank's "feeling" prior thereto was nothing more than an assumption that Webster would stand behind the obligations incurred by his sons.

Secondly, in respect of the $40,000 rent paid by Paul for the "period from 2-83 to 2-84," there is no evidence whatever that any part of that rent represented consideration for the risk of entering into the guarantee agreement. Indeed, the record shows that in 1984 an unrelated party "cash-rented the same farm land * * * for $56,200.00 annual rent." This substantial increase strongly indicates that no part of the $40,000 rent for the previous year represented anything other than payment for use of the land, and perhaps even an inadequate amount for that purpose in view of the father-son relationship between Webster and Paul. We must again call attention to the fact that the burden of proof is upon petitioners, and they have failed to carry that burden to show that the rent was anything more than payment for use of the land.

We are completely satisfied that the conditions of section 1.166-9(e), Income Tax Regs., were not complied with either literally or in spirit. As previously set forth in this opinion, the very stipulation of the parties clearly establishes that:

Petitioners did not receive any payment in the form of cash or property from David or Paul Lair for guaranteeing the loans in 1981 and 1984, and did not receive any payment in the form of cash or property from David or Paul Lair for any guarantee from 1979 forward.

We have already given undue consideration to petitioners' arguments, which ignore the dispositive effect of the

stipulation on this issue. We need not belabor the point further.

We turn briefly to petitioners' alternative position based on a claimed business bad debt. They argue that Webster's $141,000 payments on the guarantee may be treated as a deductible worthless debt since, in the words of the regulation, the guarantee agreement was "entered into in the course of the taxpayer's [Webster's] trade or business or a transaction for profit." We have already pointed out that all the otherwise applicable provisions of section 1.166-9 of the regulations are subject to the "special rules" of section 1.166-9(e). Section 1.166-9(e) imposes the requirement that the guarantor receive reasonable consideration for the guarantee agreement, which, in the case of the guarantor's spouse, son, etc., must be "in the form of cash or property." And we have already determined that petitioners are not entitled to the claimed deduction since Webster had not received the requisite cash or property consideration from Paul. We nevertheless have considered petitioners' alternative argument and find it thoroughly unconvincing.

The guarantee before us is the one signed by Webster on June 14, 1984. He was then retired, and there is no convincing evidence in the record that Webster was engaged in the farming business after April 25, 1979, when the business was carried on by his two sons, David and Paul, as "Lair Brothers." Notwithstanding the loose terminology about the "renewal" of the bank loan each year going back to the time when Webster was active in the business, the plain fact is that the June 14, 1984, guarantee on behalf of Paul was a separate and distinct guarantee agreement. It cannot fairly be characterized as entered into in the course of Webster's trade or business. Nor can we find any reasonable basis for finding that it was a transaction entered into by Webster for profit.

2. *The additions to tax.* The section 6653(a) additions involve negligence or intentional disregard of rules and regulations. The burden of proof as to such additions is upon petitioners. *Vnuk v. Commissioner,* 621 F.2d 1318, 1321 (8th Cir. 1980); *Bixby v. Commissioner,* 58 T.C. 757, 791-792 (1972). They have submitted no evidence whatever in this respect. These additions must therefore be sustained.

The section 6661 addition is for "substantial understatement" of income tax. There is no dispute that the understatement here exceeds the threshold amount set forth in section 6661(b)(1)(A). However, section 6661(b)(2)(B) provides that in the computation of the addition, the amount of the understatement shall be reduced by that portion thereof:

which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

Petitioners' opening brief did not even undertake to deal with the point. In an attempt to come within section 6661(b)(2)(B)(i), their reply brief cited several cases which were claimed to support their position, such as *Putnam v. Commissioner*, 352 U.S. 82 (1956), and *Paddock v. United States*, 52 AFTR 1656, 58-1 USTC par. 9138 (S.D. Cal. 1957). Both of these cases were decided before the promulgation of section 1.166-9, Income Tax Regs. Also, neither involved the guarantee of a loan to an individual whose relationship to the taxpayer is described in section 152(a) of the Code. Neither case provides substantial authority for petitioners' interpretation of section 1.166-9(e)(1), Income Tax Regs. Section 6661(b)(2)(B)(i) of the Code is of no help to petitioners.

In respect of section 6661(b)(2)(B)(ii), petitioners failed to comply with section 1.6661-4(b), Income Tax Regs., relating to disclosure in a statement attached to the return, which requires the taxpayer to attach either Form 8275 or a separate statement to his return. Petitioners did not comply with this regulation. Nevertheless, they could still have satisfied the requirements of section 6661(b)(2)(B)(ii) if they had provided sufficient information on their return to enable the Commissioner to identify the potential controversy. See *Schirmer v. Commissioner*, 89 T.C. 277, 285-286 (1987). See also sec. 1.6661-4(c), Income Tax Regs. While petitioners did disclose that the item for which they were claiming a $141,000 short-term capital loss involved a guarantee of a farm loan, they did not disclose the critical fact that the recipient of the loan was their son, or that Webster had

entered into the guarantee agreement without receiving the required cash or property consideration from Paul. We hold that the section 6661 addition to tax must be sustained.

*Decision will be entered for the respondent.*

