CARL CERBONE AND CECILIA ANNE CERBONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cerbone v. Commissioner
Docket No. 4694-88
United States Tax Court
T.C. Memo 1993-167; 1993 Tax Ct. Memo LEXIS 169; 65 T.C.M. (CCH) 2425; April 15, 1993, Filed *169 For petitioners: Sanford Amdur. For respondent: Julia A. Cannarozzi. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a deficiency of $ 40,026 in petitioners' Federal income tax for 1986. There are two issues for decision. The first is whether petitioners are entitled to deduct $ 100,000 as a loss on section 1244 stock. All section references are to the Internal Revenue Code. The second is whether petitioners are entitled to deduct the amount paid under certain loan guarantees as an ordinary and necessary business expense under section 162(a). FINDINGS OF FACT The parties have stipulated some of the facts and the First Stipulation for Trial, filed by the parties, together with the exhibits referred to therein, are incorporated in this opinion by reference. Petitioners are husband and wife. At the time they filed their petition in this case, they resided in Parsippany, New Jersey. During the summer of 1982, petitioners were acquainted, but they were not married. Mr. Cerbone was in the process of obtaining a divorce from another woman. He was employed by Cerdel Construction Co. (Cerdel), a company that he had founded, and that *170 had been a general contractor in the construction business for more than 27 years. Cerdel specialized in the rehabilitation of fire-damaged or vehicle-damaged buildings, the restoration of older buildings, and the custom redesign of vacant buildings. Mr. Cerbone was an appraiser of property damage. During the summer of 1982, Mr. Cerbone's future wife, Ms. Cecilia Driza, was employed as office manager by the Pike Insurance Co., which was owned by Mr. Douglas H. Pike. She had worked for that company since 1977. In 1982, Mr. Cerbone and Mr. Pike discussed the possibility of joining together in a venture to develop a hazardous waste disposal facility. Mr. Cerbone's professional background was ideal for assisting in the selection of a site that would meet the various criteria established by governmental agencies for such a facility. The discussions between Mr. Cerbone and Mr. Pike led to the formation on October 15, 1982, of a New Jersey corporation, Precision Conversion & Recovery, Inc., hereinafter referred to as PCR. The corporation was formed for the purpose of locating and developing a site in the State of New Jersey that could be used for a hazardous waste disposal facility. *171 Initially, PCR issued 77 shares of common stock to seven shareholders. Mr. Cerbone advanced $ 2,000 to Ms. Driza to purchase 20 shares of the initial issue as his nominee. He did this after disclosing his divorce proceedings to the other shareholders. Ms. Driza became the secretary and treasurer of PCR, and Mr. Pike became its president. Under Mr. Pike's direction, Ms. Driza handled all of the paperwork for the corporation, including paying bills. Ms. Driza maintained the books and records of the corporation in a file cabinet located in the rear of the Pike insurance agency. Mr. Cerbone devoted himself to finding a site that would not only meet governmental criteria for use as a waste treatment facility but would also be located in the industrial corridor and thus be convenient to waste generators in the State. Mr. Cerbone undertook the project on virtually a full-time basis. In due course, he identified a 35-acre site located on Smith Street in Perth Amboy, New Jersey (the Perth Amboy site). After obtaining approval from the other shareholders, Mr. Pike, acting as president of PCR, entered into a purchase option agreement with the owner of the Perth Amboy site, Mr. Neuberne *172 H. Brown, Jr. Under PCR's initial agreement with Mr. Brown, the option expired at the end of 1984. PCR entered into two written amendments to the purchase option, dated July 1, 1983, and January 30, 1985, that extended the option through June 30, 1986. Thereafter, Mr. Brown and PCR informally agreed to extend the option to at least June 30, 1987. This agreement was confirmed in a letter dated August 27, 1985, to Mr. Pike from Mr. Brown's attorney. After PCR identified a site, it was necessary for PCR to file a formal application for selection of the site with the New Jersey State Hazardous Waste Siting Commission. To defray the legal and engineering expenses of making formal application for selection of the Perth Amboy site, in June 1983, PCR increased the number of authorized shares of its common stock from 100 to 2,500 shares. The company recalled all outstanding shares, and on June 27, 1983, it issued 450 shares to eight shareholders. Ms. Driza exchanged her certificate for 20 shares for a new certificate for 120 shares. At approximately the same time, PCR borrowed $ 750,000 from Fidelity Union Bank and executed a promissory note to the bank in the principal amount of *173 $ 750,000. On July 5, 1983, Ms. Driza and Mr. Cerbone, who were then still unmarried, executed a Guarantee Agreement and a Pledge Agreement with Fidelity Union Bank under which they guaranteed payment of PCR's loan from the bank up to a maximum of $ 171,480. Mr. Cerbone and Ms. Driza were married on November 19, 1983. On December 15, 1983, PCR borrowed $ 188,000 from Chatham Trust Co. and executed a demand promissory note in favor of Chatham Trust Co. At approximately the same time, Mr. Pike and Mr. Cerbone executed a document under which each of them guaranteed payment of any and all obligations of PCR to Chatham Trust Co. Approximately 1 year later, PCR borrowed an additional $ 15,000 from Chatham Trust Co. Even though Messrs. Pike and Cerbone had each guaranteed the full payment of the amounts borrowed by PCR from Chatham Trust Co., the following shareholders of PCR agreed to pay the $ 188,000 loan as follows: Name
Amount
Douglas Pike
$ 75,120
Carl Cerbone
57,160
Michael McGrath
5,720
Robert Boutillier
50,000
Total
188,000
At the end of 1983, the shareholders of PCR again recapitalized the company. On December 8, 1983, the shareholders resolved to return *174 all outstanding shares to the company and to issue substitute stock certificates aggregating 1,000 shares. On December 16, 1983, Mrs. Cerbone surrendered her stock certificates for 120 shares and, in return, PCR issued two new certificates to Mr. Cerbone, one certificate for 229 shares and another for 76 shares. Neither petitioner transferred any money or property to PCR in return for the new stock certificates. Each of the shareholders of PCR agreed to guarantee the company's obligations to Fidelity Union Bank and Chatham Trust Co. in the amount of $ 750 for each share of stock received. At that time, Mr. and Mrs. Cerbone had already guaranteed $ 171,480 of PCR's loan from Fidelity Union Bank in the amount of $ 750,000, and Mr. Cerbone had guaranteed $ 57,150 of PCR'S loan from Chatham Trust Co. in the amount of $ 188,000. Actually, petitioner Carl Cerbone and Mr. Pike each had guaranteed the full amount of that indebtedness but, as of May 23, 1988, Mr. Cerbone's share of that obligation, pursuant to an agreement with the other shareholders of PCR, amounted to $ 57,150. Thus, petitioners had guaranteed $ 228,630 of PCR's loans from Fidelity Union Bank and Chatham Trust Co. *175 This amount does not take into account Mr. Cerbone's guarantee of PCR's $ 15,000 loan from Chatham Trust Co. In March of 1984, Mr. Cerbone formally resigned as an officer of PCR. His resignation was due to a matter unrelated to the facts of this case. Nevertheless, he continued to maintain an active interest in the affairs of the corporation, and Mrs. Cerbone continued as an officer of the corporation. On February 11, 1985, PCR formed a partnership with Chemcontrol U.S.A., Inc. (Chemcontrol), for the purpose of developing the Perth Amboy site. The partnership was called Envirocare International (Envirocare). PCR transferred all of its assets to the partnership in exchange for a 50-percent capital interest. Specifically included among the assets transferred to the partnership was "the Purchase Option dated January 27, 1983, as amended July 27, 1983 and January 30, 1985 (the 'Purchase Option') pertaining to the approximate 36 acres of land in Perth Amboy, New Jersey, on which the Facility is intended to be located." We note that the income tax returns filed by PCR for 1985 and 1986 do not list PCR's interest in Envirocare as an asset on the balance sheet attached to each return *176 as Schedule L. Chemcontrol, a subsidiary of a large Danish corporation, agreed to contribute to the partnership capital consisting of cash in the amount of $ 971,000 and engineering services valued at $ 372,736, for a total of $ 1,343,736. According to the partnership agreement, this amount was "equal to the value of the contributed PCR assets" with certain adjustments. The record does not reveal, what, if any, capital contribution Chemcontrol actually made. On September 17, 1985, Fidelity Union Bank declared PCR's promissory note in default. On December 9, 1985, petitioners executed a secured note to First Fidelity Bank (formerly Fidelity Union Bank) in the principal amount of $ 120,000. As security for their promissory note, they executed an open-ended mortgage and a security agreement. During 1986 and 1987, petitioners made the following payments to First Fidelity Bank: Date
Principal
Interest
03/08/86
$ 3,000
$ 3,150.00
06/10/86
3,000
2,915.33
09/02/86
3,000
2,681.37
12/04/86
3,000
2,362.41
03/09/87
3,000
2,294.29
06/04/87
3,000
2,379.20
09/01/87
3,000
2,410.39
10/26/87
99,000
2,118.66
Petitioners also paid $ 8,860.17 in interest to Chatham *177 Trust Co. during those years. At the time of the trial of this case, Mr. Cerbone was a defendant in a collection action in the State courts of New Jersey for the balance of PCR's debts to Chatham. The complaint in that action alleges that $ 57,160 of the original principal amount of $ 188,000 remained due and owing on the Promissory Note dated December 15, 1983. The complaint also alleges that $ 11,500 of the original principal amount of $ 15,000 remained due and owing on the Promissory Note dated December 27, 1984. By March of 1986, Chemcontrol was actively negotiating with a company, N.J. Resources, for that company to participate in the project in lieu of PCR. During 1986, Chemcontrol took the position that PCR had violated the partnership agreement by failing to submit an application to the siting commission. PCR countered that Chemcontrol had violated the partnership agreement by failing to contribute funds to the partnership. On or about October 25, 1986, Mr. Pike met with the chairman of Chemcontrol, Mr. Ole Scherfig, to discuss the role of PCR with respect to the Perth Amboy project and other projects in the State of New Jersey. The two men discussed their differences, *178 and Mr. Scherfig asked how much money would be necessary to buy out PCR's interest in the partnership. Mr. Pike described his response to Mr. Scherfig in a letter to the shareholders of PCR, dated October 25, 1986, as follows: DP [i.e., Douglas Pike] stated the minimum demand of $ 2,250,000. [sic] for outright buy out or a term arrangement of $ 1 mil up front, $ 1 mil upon Siting and "a percentage" of the gross revenue for a period of 5 years when the operations begin.
Mr. Pike concluded his letter to the shareholders with the following: It appears that final agreement will not be reached by 12/31/86, if at all, and the shareholders have stated that we should exercise the apparent tax benefit of a 1244 Corp. this year. I would appreciate your advice with respect to this option after you have secured tax advice from counsel. Please let me know your decision as soon as possible. I will set a date for another shareholders meeting only after I have received advice from each of you.
On November 12, 1986, Mr. Pike again wrote to the shareholders of PCR, including Mr. Cerbone, and stated as follows: Dear Shareholder: After considerable discussion, investigation *179 and advice, it appears that a decision on taking a loss in 1986 under the provisions of Section 1244 is clear. You should consider the possibility or probability of a meaningful offer by the Chemcontrol side to buy us out of the Envirocare partnership (you have my letter of October 25, 1986). If you feel the chances for such action are good, you might forgo taking the loss in 1986 and await the outcome of the anticipated negotiations for recovery from the Chemcontrol group. The downside, if there is no buy out, is a top tax benefit of 50% in 1986 and a 38.5% benefit in 1987. If you believe the potential for recovery is poor or nil, you might sell your stock to the Corporation for $ 1.00 and take the maximum tax advantage in 1986. Such action would permit no future recovery and there would be no strings attached. The choice is yours and I would appreciate your decision after due consideration. It might be in order to observe that no economic decision should be based solely on the basis of taxes. Very truly yours, Douglas H. Pike, President DHP:jlp
No stockholder of PCR accepted the above offer to sell his or her stock to the corporation for $ 1. At the *180 end of 1986, Mr. Pike, as president of PCR, and Mr. Scherfig, as chairman of Chemcontrol International, exchanged letters which contemplated later meetings and continued discussions to resolve their differences. During these continued negotiations, PCR reduced the asking price for its partnership interest in Envirocare to $ 2 million. That offer was rejected on behalf of Chemcontrol by its attorney, Albert Burstein, in a letter dated June 16, 1987. PCR's attorney, Peter G. Stewart, responded to Mr. Burstein in a letter dated June 26, 1987, which enumerated the steps which PCR had taken "at its own cost and expense to keep an active profile in the State of N.J. for Envirocare." Among other steps, Mr. Stewart listed the following: 9. PCR has continued negotiations with Neuberne Brown to make certain that the application before the N.J. Siting Commission was not withdrawn due to a lack of 12/15/86 and 6/15/87 option payments. 10. PCR conducted discussions with the Siting Commission staff within the last 30 days updating the present status of the application.
Mr. Stewart concluded his letter as follows: In regard to a possible buy out of PCR's interest, I have discussed *181 with management, a reduction in our $ 2,000,000 proposal and management has indicated a willingness to accept a figure in the area of $ 1,750,000 for a complete buy out of the PCR partnership interest in Envirocare.
Apparently, Mr. Pike wrote a letter to Mr. Burstein dated September 3, 1987, in which he proposed, as a "counter-offer", that Chemcontrol pay $ 750,000 in cash to PCR's investors plus one-half of PCR's payables of $ 242,249. Mr. Burstein rejected that counteroffer in a letter to Mr. Stewart dated September 25, 1987, but he reiterated Chemcontrol's offer to pay $ 500,000. Negotiations between PCR and Chemcontrol for the dissolution of the partnership continued into 1988. Mr. Burstein wrote a letter to Mr. Stewart dated February 1, 1988, in which he enumerated the claims of certain creditors in the aggregate amount of $ 84,300 that his clients were willing to pay, subject to certain conditions. PCR never responded to Mr. Burstein's letter, and no agreement was ever reached between PCR and Chemcontrol. Petitioners filed a joint Federal income tax return for calendar year 1986. On Schedule A thereof, petitioners reported a miscellaneous deduction of $ 100,000 for *182 "PCR Corp -- Sec. 1244 Loss". Petitioners did not attach a statement to their return setting forth any of the information required under section 1.1244(e)-1(b), Income Tax Regs. On Schedule D, Capital Gains and Losses, of their 1986 return, petitioners reported a short-term capital loss of $ 130,640 for "PCR Corp." stock. After offsetting long-term capital gains of $ 6,954, petitioners deducted $ 3,000 of the capital loss and treated the remainder, $ 120,686, as a capital loss carryover. In summary, petitioners reported losses of $ 100,000 and $ 130,640, and, in effect, they claimed an aggregate basis in their PCR stock of $ 230,640. In this connection, we note that the aggregate amount of the bank loans which petitioners guaranteed, $ 228,630, plus the initial cash investment in the stock of PCR, $ 2,000, totals $ 230,630. Petitioners also claimed that the stock had become worthless in 1986. The only adjustment made by respondent in the subject notice of deficiency was to disallow the ordinary loss deduction of $ 100,000 on the ground that "insufficient information was submitted to substantiate the loss claimed". Respondent did not disallow the capital loss claimed by petitioners. *183 OPINION The first of two issues to be decided in this case is whether petitioners are entitled to deduct $ 100,000 from their 1986 income, pursuant to section 1244(a). The denial of that deduction was the only adjustment made by respondent in the notice of deficiency, and petitioners' eligibility for the deduction was the only issue raised in the subject petition. The second issue to be decided is whether petitioners are entitled to deduct "$ 229,200" or "$ 232,000" as an ordinary and necessary business expense under section 162. Petitioners allege that this is "the full amount of their investment in" PCR. They raised this issue in a pleading in the nature of an amendment to their petition. Petitioners do not explain how either amount was computed or why the amounts differ from the basis claimed on their 1986 return, $ 230,640. In any event, petitioners bear the burden of proving that they are entitled to any of the deductions that they claim. Rule 142(a), Tax Court Rules of Practice and Procedure.
Deduction Under Section 1244
Respondent raises a number of arguments why petitioners are not entitled to the section 1244 deduction claimed on their return. Respondent *184 contends: (1) That petitioners' PCR stock did not become worthless during 1986; (2) that PCR was not a small business corporation as defined by section 1244(c)(3); (3) that petitioners failed to attach to their 1986 income tax return a statement of the information required under section 1.1244(e)-1(b), Income Tax Regs.; and (4) that petitioners' PCR stock was not originally issued to Mr. Cerbone, as required by section 1.1244(a)-1(b), Income Tax Regs.
Generally, if a taxpayer holds the stock of a corporation as a capital asset and the stock becomes worthless during the taxable year, then the taxpayer is entitled to deduct the loss resulting therefrom as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. Sec. 165(g)(1). The amount of the loss is the taxpayer's adjusted basis in his or her stock. Sec. 1011. The deduction of such amount is limited to the amount of the taxpayer's gains from sales or exchanges of capital assets plus the lower of $ 3,000, or the excess of capital losses over capital gains. Sec. 1211(b). Unused net capital losses can be carried over to succeeding taxable years. Sec. 1212(b). Section 1244 is a special rule *185 which allows an individual to treat a loss on "section 1244 stock" as an ordinary loss up to $ 100,000 in the case of a joint return, rather than as a loss from the sale or exchange of a capital asset. Sec. 1244(a). To be eligible to deduct a loss under section 1244, the taxpayer must establish that he or she sustained a loss during the taxable year on the sale or exchange of "section 1244 stock". Sec. 1244(a). A loss on "section 1244 stock" is eligible for treatment under section 1244 if it arises in a transaction treated as a sale or exchange, such as worthlessness. Sec. 1.1244(a)-1(a), Income Tax Regs.; see also sec. 165(g)(1). In this case, petitioners contend that they sustained a loss when the stock of PCR became worthless at the end of 1986. Petitioners' post-trial brief states as follows: At the end of the year 1986, shares of stock in PCR, Inc. were worthless and had no value. Although testimony by a representative of the joint venture may indicate some value to the partnership interest, this value and any amounts were far less than the outstanding indebtedness of PCR, Inc. Most important is that the option to acquire the specific land site in Perth Amboy, New *186 Jersey to construct a hazard waste facility expired on June 30, 1986. When such option expired, the objectives and operations of PCR, Inc. ended.
As stated above, petitioners' post-trial brief asserts that the purchase option to acquire the Perth Amboy site was not renewed after June 30, 1986. Accordingly, petitioners contend that, on June 30, 1986, PCR "lost its prime and sole asset, its ownership in the option for the Neuberne Brown real property." Petitioners further contend that PCR's partnership interest in Envirocare, PCR's only asset, was worthless because the partnership dissolved "when the option to acquire the Perth Amboy property expired in June, 1986." Citing Weiss v. Commissioner, T.C. Memo. 1954-51, petitioners argue that the expiration of the option to acquire the Perth Amboy site is the identifiable and fixed event which marks the closed and completed transaction during 1986 from which the loss arose. As proof that the stock of PCR became worthless at the end of 1986, petitioners rely on their own testimony at trial. Mrs. Cerbone testified that on December 31, 1986, PCR "was insolvent", and it had no employees or assets. She *187 also testified that the option on the Perth Amboy site was not renewed after June 30, 1986. Similarly, Mr. Cerbone testified that PCR's option on the Perth Amboy site expired in June 1986 and that PCR's partnership with Chemcontrol dissolved in June of 1986 because "the sole intent of the partnership was to get approval for this site and once the option was then canceled there would be no reason for the partnership agreement, unless they wanted to go into another site and start the thing all over again from scratch." Mr. Cerbone also testified that on December 31, 1986, PCR had no option, no money, and no operations. Petitioners dismiss the testimony of Mr. Burstein. He represented Chemcontrol in its attempt to buy out PCR's interest in the Envirocare partnership so that Chemcontrol could dissolve the partnership and free itself from any restrictions imposed by the partnership agreement. Mr. Burstein confirmed the negotiations between PCR and Chemcontrol which culminated in 1987 with Chemcontrol's offer to pay $ 500,000 for PCR's interest in the partnership. He testified that PCR never responded to that offer. Petitioners suggest that Mr. Burstein's testimony has no logical *188 or factual basis. Petitioners also argue that "even if Chemcontrol, USA, Inc., were to pay such amounts as suggested by Mr. Burstein, the overall outstanding indebtedness of PCR would not be satisfied by these payments and the shares would still be worthless." Contrary to petitioners' testimony at trial, it appears that the Envirocare partnership did not dissolve in 1986. Mr. Pike had taken steps to extend the purchase option for the Perth Amboy site until June 30, 1987. The record of this case contains a letter written on behalf of Mr. Neuberne H. Brown, Jr., dated August 27, 1985, which states as follows: Mr. and Mrs. Brown agreed to extend the existing Option Agreement on the same terms and conditions and at an option price of $ 175,000 plus real estate taxes of approximately $ 30,000 for each six-month period through June 30, 1987.
Mr. Pike wrote a memorandum dated March 12, 1986, to the shareholders of PCR which states: Brown has agreed verbally that our option is in effect and that he will take stock in PCR in lieu of payment ($ 410,000). * * *
In addition, PCR's attorney, Peter G. Stuart, wrote a letter to Mr. Burstein dated June 26, 1987, which enumerated *189 a number of actions which had been taken after December 31, 1985, "to keep an active profile in the State of N.J. for Envirocare." Among those actions was the following: PCR has continued negotiations with Neuberne Brown to make certain that the application before the N.J. Siting Commission was not withdrawn due to a lack of 12/15/86 and 6/15/87 option payments.
Furthermore, at the end of 1986, there was the possibility that Chemcontrol would purchase PCR's interest in the partnership in order to dissolve the partnership and thereby free itself from any restrictions imposed by the partnership agreement. On October 25, 1986, Mr. Pike reported to PCR's shareholders that he had demanded $ 2,250,000 for PCR's interest. Significantly, no shareholder accepted the offer made by Mr. Pike as president of PCR on November 12, 1986, to purchase the interest of any stockholder in the corporation for $ 1. In addition to their testimony at trial, petitioners introduced the income tax returns filed on behalf of PCR for 1984, 1985, and 1986. However, the balance sheets attached to those returns, as Schedule L, do not reflect PCR's interest in the partnership. Petitioners introduced no *190 other financial records of PCR. They also introduced no testimony from Mr. Pike or any other person who is knowledgeable about the affairs of PCR. Mr. Cerbone resigned as an officer of PCR effective on March 1, 1984. His only relationship to the corporation during 1986 and 1987 was that of shareholder. Similarly, Mrs. Cerbone's testimony makes clear that she was not privy to all of the discussions conducted by Mr. Pike. On direct examination, she answered a question from her attorney as follows: Q. In 1987 do you recall if any discussion was brought about the corporation selling assets? A. No. I was not involved in anything directly. I heard discussions with Mr. Pike having discussions with other people but I was not privy to them and certainly don't know the content of them.
On cross-examination, Mrs. Cerbone stated as follows: Q. Were you aware of any negotiations going on with Chem Controls and PCR? A. I knew there were negotiations going on. I was not aware of the specifics of the negotiations. * * * Q. Now you testified that you were not privy to discussions regarding a buy out of PCR's interest in Chem Control, is that correct? A. That *191 is correct.
Mrs. Cerbone acknowledged that there were discussions about giving stock to Mr. Neuberne Brown in lieu of an option payment. Mrs. Cerbone testified as follows on direct examination: Q. Mr. Brown was not a shareholder of PCR at any time? A. I really don't remember. I know there were these discussions to waive an option payment but I'm not --
Based upon the above, it appears that neither Mr. Cerbone nor Mrs. Cerbone was in a position to be fully aware of the negotiations between PCR and Mr. Neuberne Brown concerning the extension of PCR's option to acquire the Perth Amboy site. Similarly, neither Mr. Cerbone nor Mrs. Cerbone was in a position to be fully aware of the negotiations between PCR and Chemcontrol to buy out PCR's interest in the partnership. Furthermore, petitioners' argument that the offer of $ 500,000 made by Chemcontrol in 1987 would not have satisfied the outstanding indebtedness of PCR misses the point that the evidence in this case shows that at the end of 1986, the stock of PCR was not worthless. At that point, Mr. Pike had asked for approximately $ 2 million for PCR's interest in Envirocare. For the above reasons, we find that petitioners *192 have failed to prove that the stock of PCR became worthless during 1986. Thus, petitioners have failed to prove that they sustained a loss that may be treated as an ordinary loss under section 1244, as opposed to a capital loss. We sustain respondent's determination that petitioners are not entitled to deduct $ 100,000 under section 1244 on their 1986 return. Accordingly, it is unnecessary to consider the other reasons advanced by respondent to justify her determination. It is also unnecessary to consider the amount of the loss and to decide whether a shareholder who guarantees the debts of his or her C corporation is entitled to treat the amount guaranteed as an increase in his or her basis in the stock of the corporation, prior to the time the shareholder makes an "economic outlay" under the guarantee. Compare Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989) (disallowing increase in basis in S corporation, absent economic outlay or realization of income on the part of the shareholder) with Plantation Patterns, Inc. v. Commissioner, T.C. Memo. 1970-182, *193 affd. 462 F.2d 712 (5th Cir. 1972) (finding indirect capital contribution resulting from shareholder guarantee of C corporation debt, without analyzing presence of economic outlay). Deduction Under Section 162
The second issue for decision is whether petitioners are entitled to deduct the amount paid under certain loan guarantees as ordinary and necessary business expenses under section 162. As mentioned above, petitioners raised this issue in an amendment to their petition. Petitioners' post-trial brief refers to it as an "alternative" issue. At the outset, we note that there are three preliminary matters raised by petitioners' alternative issue. First, we must consider the legal basis for the claimed deduction. In addition to raising section 162, petitioners' post-trial brief cites several cases involving the deduction of bad debts under section 166 and draws the following conclusion: Based upon the aforestated, the deduction available to Petitioner Cerbone should be in the minimum amount of the repayment to First Fidelity loan, paid as guarantee payment in furtherance of his trade or business under the provisions of Section 162 and Section *194 166 of the Internal Revenue Code.
Petitioners' post-trial brief is the first and only instance in these proceedings in which they have asserted that the loan guarantee payments are deductible under section 166. They did not raise section 166 in their petition or in any of the other pleadings that they filed in this case. They did not raise section 166 in their so-called "Motion for Leave to Supplement Petition and Proposed Supplement", which sought permission to amend their petition, and their attorney did not mention section 166 during the hearing that took place on that motion. Finally, petitioners' attorney did not mention section 166 in his opening statement at trial or at any other time during trial. We will not consider issues that are raised for the first time on brief. Rules 41(b), 34(b)(4), Tax Court Rules of Practice and Procedure; Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). Accordingly, we agree with respondent that the applicability of section 166 is not at issue in this case. The *195 second preliminary matter to consider is the fact that petitioners' post-trial brief sets forth at least two different dollar amounts as the amount which petitioners guaranteed on behalf of PCR, $ 232,000 and $ 229,200. Petitioners do not explain how either amount was calculated. We find that petitioners' guarantee consisted of two amounts, which together equal $ 228,630. First, they guaranteed $ 171,480 of a loan in the principal amount of $ 750,000 made by First Fidelity Bank, formerly Fidelity Union Bank, to PCR on June 30, 1983. Second, Mr. Cerbone guaranteed $ 57,150 of a loan of $ 188,000 made by Chatham Trust Co. to PCR on December 15, 1983. The total of these two amounts, $ 228,630, is close to each of the above amounts used in petitioners' post-trial brief. This total, however, does not include any part of the $ 15,000 loan from Chatham Trust Co. which Mr. Cerbone also guaranteed. The third preliminary matter raised by petitioners' alternative contention is to establish the portion of the amount guaranteed that petitioners paid during 1986. The parties have stipulated that at the end of 1985, when First Fidelity Bank declared PCR'S loan in default, petitioners gave *196 the bank a secured promissory note in the principal amount of $ 120,000. The parties have also stipulated that petitioners made aggregate principal payments on such note in the amount of $ 12,000 in 1986 and $ 108,000 in 1987. Petitioners may have also made a cash payment of $ 50,000 during 1985 before the bank accepted the note for $ 120,000. In any event, the total principal amount paid by petitioners during the year 1986 under the above loan guarantees was $ 12,000. Taxpayers who report income on the cash receipts and disbursements method of accounting are entitled to deduct only those expenses actually paid during the tax year. Mitchell v. Commissioner, 42 T.C. 953, 969 (1964); sec. 1.461-1(a)(1), Income Tax Regs. Accordingly, the maximum amount that petitioners could deduct for 1986 as a business expense under section 162 is $ 12,000. Petitioners' contention is that the subject loan guarantee payments are deductible under section 162. They argue in their post-trial brief as follows: At the request of National Community Bank, the prime lender for his corporation, Cerdel Construction Company, he [Mr. Cerbone] was required to make arrangements *197 to repay First Fidelity Bank and other lenders in order to maintain lines of credit for the expansion and restart of his own business. * * * As an alternative argument, Petitioner presents as an issue that as a stockholder of PCR, Inc. in furtherance of the same trade or business, an employee stockholder of his construction company, Petitioner's repayment of the PCR guaranteed loans was an ordinary and necessary business expense, necessary for the continuation of the business of Cerdel Construction Company. * * * * * * In the case at hand, Mr. Cerbone was an employee of PCR, as well as a stockholder. He was an officer, of a similar or related construction business, Cerdel Construction Company, the corporation in which he was the sole stockholder. His payments on behalf of PCR, Inc. as a shareholder and employee, in order to continue the operations of Cerdel Construction Company, Inc., would lend support for an argument under Section 162 of the Internal Revenue Code. These bank loan repayments made were ordinary and necessary business expense payments on the part of Cerbone for the "dominant motivation" of continuing his trade, occupation and business.
To prevail on the *198 above contention, petitioners must prove that the subject payments gave rise to an ordinary and necessary business expense as opposed to something else, such as a debt from PCR, or a capital contribution to PCR. See Roussel v. Commissioner, 37 T.C. 235, 241-242 (1961). Typically, when a guarantor makes payment to a creditor in discharge of a guarantee, the guarantor becomes the creditor to the extent of the amount paid under the guarantee. Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Black Gold Energy Corp. v. Commissioner, 99 T.C.    ,     (1992) (slip op. at 7-8); Lair v. Commissioner, 95 T.C. 484, 490 (1990). The principal obligor is normally obligated to repay that amount to the guarantor. The Supreme Court summarized the law of subrogation in Putnam v. Commissioner, supra at 85, as follows: The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original *199 debt from the creditor to the guarantor who steps into the creditor's shoes. * * * [Fn. ref. and citations omitted.]
Not all guarantee payments, however, give rise to a debt from the debtor. See In re Lane, 742 F.2d 1311, 1319-1320 (11th Cir. 1984); Casco Bank & Trust Co. v. United States, 544 F.2d 528, 530-531 (1st Cir. 1976); Santa Anita Consolidated, Inc. v. Commissioner, 50 T.C. 536, 550 (1968). For example, in the case of a payment made by a shareholder in discharge of his guarantee of corporate indebtedness, such as is involved in this case, the question whether the payment gives rise to a debt or is an indirect capital contribution is resolved by an investigation of the facts in the light of traditional debt-equity principles. See In re Lane, supra at 1314-1318; Casco Bank & Trust Co. v. United States, supra at 532; Santa Anita Consolidated, Inc. v. Commissioner, supra at 550; Plantation Patterns, Inc. v. Commissioner, T.C. Memo. 1970-182; cf. *200 Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), in the case of a subchapter S corporation. The determination of the character of a payment under a guarantee is made as of the time of the guarantee, rather than at the time of the payment. E.g., Roussel v. Commissioner, supra at 242; see also In re Lane, supra at 1319-1320. This is because a "debt" not only implies a legal obligation to pay, but also the expectancy, on the part of the creditor, of receiving payment. Roussel v. Commissioner, supra at 242. Since a guarantor is usually called upon to pay after the debtor is no longer in existence or is insolvent, if the character of the payment were determined at that time, the guarantor would have little hope of reimbursement by the debtor and the payment would invariably be classified as something other than a debt. Id.
If a guarantor's payment is found to give rise to a debt, then the guarantor cannot deduct the payment as a business expense under section 162. See Horne v. Commissioner, 59 T.C. 319, 336 (1972), affd. 523 F.2d 1363 (9th Cir. 1975); *201 Smith v. Commissioner, 55 T.C. 260, 267 (1970), vacated on other grounds and remanded 457 F.2d 797 (5th Cir. 1972). In that event, the guarantor can deduct the payment only when, and in the amount, permitted under section 166. See, e.g., Horne v. Commissioner, supra at 335; Cho v. Commissioner, T.C. Memo. 1976-318. Similarly, if a guarantor's payment is found to give rise to an indirect contribution to capital, the payment is not deductible as a business expense under section 162. See Downer v. Commissioner, 48 T.C. 86, 90 (1967); Eskimo Pie Corp. v. Commissioner, 4 T.C. 669, 676 (1945), affd. 153 F.2d 301 (3d Cir. 1946); Lutz v. Commissioner, T.C. Memo. 1959-32. In that event, it follows that the amount of the payment would be treated as an increase of the guarantor's basis in the stock of the corporation under section 1012. The point to be noted here is that a guarantee payment cannot be a deductible expense under section 162 if it is *202 either a debt or an indirect contribution to capital. We are not called upon to decide whether the guarantee payments at issue here gave rise to debt instead of equity. The issue here is whether, as petitioners contend, the subject payments are ordinary and necessary business expenses deductible under section 162. Petitioners bear the burden of proof as to that issue. Rule 142(a), Tax Court Rules of Practice and Procedure. Nevertheless, for petitioners to prevail, we must be satisfied that the payment is neither a debt nor an indirect capital contribution. Petitioners' contention that the subject payments qualify as business expenses is based entirely on Mr. Cerbone's testimony at trial. He testified concerning the business purpose of the subject loan guarantee payments as follows: Q. What kind of arrangement for repayment did you enter into with First Fidelity or Fidelity Union Bank? A. My wife and I went to Fidelity at that time and an initial payment was made of I believe $ 50,000. They then gave us a term note that was guaranteed by my personal property. Q. Were you dealing with the First Fidelity Bank at that time? A. I personally was not. Q. What *203 lending -- What bank were you involved in? A. At that time and now I deal with National Community Bank, the East Hanover branch in New Jersey. Q. Did National Community Bank request any guarantees or any information from you? A. Yes. As normal course of my construction company, I maintain a yearly credit line that must be cleared once a year in March, and when they ran a search on my properties they picked up the liens that were placed by First Fidelity and my credit line would not be advanced until those First Fidelity liens were cleared. * * * Q. Do you use lines of credit with banks? A. Yes, I do. Q. Were any of your lines of credit affected by your loans outstanding for the benefit of PCR? A. Yes, they were. Q. To what lending institutions, what banks? A. National Community Bank and because I had devoted so much time with PCR and reduced my operation to a skeleton crew, the type of accounts, the size of the accounts that I was maintaining in National Community Bank at the time were greatly reduced. Then when I went in for the additional credit line and they saw that I had this lien placed on me by Fidelity Union -- I mean on my property, *204 on my house -- they said that in order to maintain the credit line that I would have to pay off First Fidelity. * * * Q. Do you use banks for purposes of your business? A. Yes, I have to. Q. For what reason? A. For lines of credit. We do a lot of work for insurance companies, as an example, where the initial cost for the reconstruction of a building would not be paid for 30, 60, or 90 days, so my line of credit would act in reality as a bridge loan between the time that I would start the job and the time that I would be receiving the payments from, say, an insurance company. Q. And you're an employee of your own construction company? A. I'm an employee, yes. Q. And you personally sign with any banks? A. Yes. Q. Does the corporation also sign? A. Yes, it does. Q. In your own opinion and your own understanding, did the outstanding loans you had with First Fidelity Bank or Chatham affect your business with Serdel [sic] Construction? A. It almost knocked me right out of business. Q. How? A. When the -- I had been running a good sound business for a good many years. When I was working day and night for PCR and reducing my operations *205 down to just a skeleton crew and doing appraisals, the type of accounts that I maintain were drastically reduced. After the searches took place and the disclosures were made as to the amount of guarantees that I had, it was quite evident that the only way I could work my way out of it was to pay off Fidelity and to pick myself up by the bootstraps and increase my operations so that it would be able to support the indebtedness and then go on from there. Q. Did anyone instruct you to do this, or recommend this? A. Well, I sought counsel from other people, attorneys and from accountants, and it was quite evident that the only person that could get myself out of it was me. Q. Did any lending institutions request repayment? Ms. Cannarozzi: Objection, calls for hearsay. The Court: Sustained. By Mr. Amdur: Q. Were you ever requested by any lending institutions to reduce your liabilities? A. Yes. Q. What lending institutions? A. National Community Bank. * * * Q. During the year 1986, were you required to repay any outstanding indebtedness incurred from PCR? A. Before my credit line would be approved, I had to pay off Fidelity Union Bank. Q. *206 And if you did not, what would happen? A. I would not have my credit line extended. Q. Would that adversely affect your business? A. As I indicated, it probably would have knocked me out of business. Q. And you acted direct with the bank's request? A. That's right. I had to comply with that request and they did extend my credit line. After I paid off Fidelity Union my credit line was extended and it has been extended every year since. Q. It was only after the payment to First Fidelity. [sic] A. Yes.
In the above excerpt, Mr. Cerbone states his belief that it was necessary to make guarantee payments to First Fidelity Bank during 1986 in order to establish or preserve a line of credit used in connection with his or Cerdel's construction business. We have a number of difficulties with Mr. Cerbone's testimony. First, we find his testimony to be vague. For example, we cannot divine from Mr. Cerbone's testimony whether the line of credit had been issued to him or to Cerdel. Petitioner did not introduce any correspondence from National Community Bank or any testimony from a representative of that bank. Similarly, we are at a loss to understand whether *207 Mr. Cerbone made the subject guarantee payments to protect his position as a shareholder of PCR, to protect his position as an employee of Cerdel, or in connection with Cerdel's business. Second, and more importantly, both Mr. Cerbone's testimony and petitioner's argument are directed to establishing a relationship between the guarantee payments and some business of Mr. Cerbone's at the time of the payment in 1986. However, as mentioned above, the character of a guarantee payment must be established as of the time of the guarantee, rather than the time of the payment. E.g., Roussel v. Commissioner, 37 T.C. at 242; see also In re Lane, 742 F.2d at 1320. In his testimony, Mr. Cerbone explains nothing about his entering into the guarantee or his relationship with PCR at that time which would establish that the later payments under the guarantee should be treated as business expenses, rather than as debts or contributions to capital. Taking Mr. Cerbone's testimony at face value, we surmise that National Community Bank had issued a line of credit to Cerdel and that Mr. Cerbone had used his house to provide collateral for *208 that line of credit. We further surmise that after First Fidelity declared PCR's loan to be in default, it placed a lien on Mr. Cerbone's home and possibly other property. When National Community Bank found that Mr. Cerbone's property was subject to the lien, it would not accept that property as collateral for Cerdel's line of credit. In effect, Mr. Cerbone did not have sufficient assets to satisfy both banks. Nothing in Mr. Cerbone's testimony or in the record of this case permits us to conclude that, as of the time Mr. Cerbone entered into the subject guarantee of PCR's loan from First Fidelity Bank, any payment under the guarantee would give rise to a business expense, as opposed to a debt or a contribution to capital. It is not necessary for us to specifically decide which of the two is involved in this case because, as discussed above, the payments would not be deductible under section 162 in either event. Nevertheless, the facts of this case strongly suggest that petitioners' payments under the guarantee of PCR's loan from First Fidelity Bank gave rise to equity in PCR, rather than a debt from PCR. For example, Mr. Cerbone testified at trial that the shareholders of PCR *209 guaranteed PCR's loan from First Fidelity "proportionate to the amount of stock that they would be getting". The parties also stipulated as follows: The shareholders agreed to guarantee the corporation's obligations to Fidelity Union Bank and Chatham Trust Co. in the amount of $ 750.00 for each share they received.
This stipulation suggests that, at the time petitioners entered into the guarantee, they considered any amount that they might be called upon to pay as a contribution to PCR's capital and not as a debt from PCR, and that they did not expect repayment by PCR. Indeed, on their 1986 Federal income tax return, petitioners claimed a deduction under section 1244 of $ 100,000 of the amount that they guaranteed. By doing so, in effect, they represented that the guarantees were entered into in connection with the acquisition of their stock in PCR. As discussed above, they continue to assert that position in this case. In summary, the record strongly suggests that Mr. Cerbone had personally guaranteed PCR's loan from First Fidelity Bank in his capacity as an investor in PCR, and there is nothing in the record to show that petitioners' payment of the loan guarantee to *210 First Fidelity Bank gave rise to an ordinary and necessary expense as opposed to an indirect contribution to capital or a debt. Accordingly, we hold that petitioners failed to meet their burden of proof on this issue. A final point must be addressed. Respondent asks the Court to find that petitioners are subject to an income tax deficiency for 1986 greater than the amount determined in the notice of deficiency. As mentioned above, the notice of deficiency is based on the disallowance of $ 100,000 of the alleged loss which petitioners deducted under section 1244. According to respondent, the increased deficiency is based on the disallowance of the entire loss claimed by petitioners in 1986 on their PCR stock. Thus, respondent asks the Court to disallow the $ 3,000 capital loss deducted on petitioners' 1986 return and to include in petitioners' income additional capital gain in the amount of $ 6,954, consisting of the amount offset against the loss on the PCR stock. We agree with respondent that petitioners have failed to prove that they sustained a loss during 1986 on their PCR stock. However, we cannot determine a deficiency greater than that determined in the notice of deficiency *211 because respondent did not assert the increased deficiency "at or before the hearing or a rehearing", as required by section 6214(a). See Browning v. Commissioner, T.C. Memo. 1991-93. For the foregoing reasons, Decision will be entered for respondent.